**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) **Chapter 7** |
| **BOSTON GRAND PRIX, LLC** | ) |
| Debtor. | ) **Case No. 16-12574-MSH** |
| | ) |
| **GARY W. CRUICKSHANK, CHAPTER 7 TRUSTEE OF THE ESTATE OF BOSTON GRAND PRIX, LLC,** | ) |
| Plaintiff, | ) |
| v. | ) **Adv. Proc. No.: 16-** |
| **JOHN F. CASEY; CASEY SUMMIT, LLC; LASER LEASING, INC., d/b/a AESTHETIC LASER EXCHANGE; AESTHETIC MEDICAL LASERS, LLC, a Colorado Limited Liability Company; AND GAYLE CASEY,** | ) |
| Defendants, | ) |
| And | ) |
| **CASEY SUMMIT, LLC; LASER LEASING, INC., d/b/a AESTHETIC LASER EXCHANGE; AESTHETIC MEDICAL LASERS, LLC, a Colorado Limited Liability Company; CATHERINE M. CASEY AS TRUSTEE OF 36 ELLERY STREET NOMINEE TRUST; and CATHERINE M. CASEY AS TRUSTEE OF THE CASEY FAMILY TRUST,** | ) |
| Reach and Apply Defendants, | ) |
| And | ) |
| **BANK OF AMERICA CORP.; CITIZENS BANK OF MASSACHUSETTS; LEADER BANCORP, INC.; PEOPLE'S UNITED FINANCIAL, INC.; TD BANK, N.A.; SANTANDER HOLDINGS, USA; UBS FINANCIAL SERVICES, INC.; FMR, LLC d/b/a FIDELITY INVESTMENTS; PRUDENTIAL FINANCIAL, INC.; JANNEY MONTGOMERY SCOTT, LLC; STERLING BANCORP a/k/a STERLING NATIONAL BANK; AND RAYMOND JAMES & ASSOCIATES, INC.** | ) |
| Trustee Process Defendants. | ) |

**VERIFIED COMPLAINT**
**PRELIMINARY STATEMENT**

Gary W. Cruickshank, as he is the duly appointed Chapter 7 Trustee (the "Trustee")

of the bankruptcy estate (the "Estate") of Boston Grand Prix, LLC ("BGP" or the "Debtor"),

brings this action seeking to recover damages arising from the systematic looting of BGP by

John F. Casey and his wholly owned limited liability company, Casey Summit, LLC.  As set

forth in further detail below, Casey used BGP as his personal piggy bank, paying hundreds of

thousands dollars for personal expenses, including for tens and possibly hundreds of thousands

of dollars for personal expenses charged on personal credit cards, diverting hundreds of

thousands of dollars into a bank account he controlled, transferring tens of thousands of dollars

to related entities, and failing to account for hundreds of thousands of additional dollars

disbursed by BGP.  Casey, an experienced Certified Public Accountant, failed to maintain any

semblance of adequate financial records for BGP, not out of ignorance, but intentionally to

conceal his self-dealing and the systematic looting of BGP.

The Trustee also seeks to pierce the Debtor's corporate veil and hold John Casey

personally liable for the debts of BGP.  Among other things, Casey, as managing member,

officer and person in control of BGP: (i) indiscriminately spent hundreds of thousands of BGP's

funds for personal purposes without restriction and without substantiating documents; (ii) caused

BGP to pay him excessive compensation in the form of direct payments, payments to entities he

controlled and to third parties for his benefit in the amount of at least $948,992.59; (iii) failed to

produce documents to identify or records to substantiate the business purpose for at least

$862,580.15 of BGP's disbursements, such that the actual amounts paid to Casey or for his

benefit could be at least $1,811,572.74; (iv) paid at least $653,374.53 to other members of BGP,

purportedly for consulting services; (v) in total, when including the $862,580.15 in

undocumented disbursements, caused BGP to pay to insiders approximately 41% of a total of

$6,001,275.35 disbursed by BGP; (vi) failed to observe corporate formalities and failed to

respect BGP as a separate legal and taxable entity; (vii) diverted hundreds of thousands of dollars into a bank account he controls; and (viii) failed to maintain business records so that the flow of funds for his personal benefit could be traced or so that the income and expenses of BGP could be traced.  As such, BGP was merely Casey's alter ego.

Casey owed BGP fiduciary duties of care, loyalty and good faith to BGP.  Casey breached these duties by, among other things: (i) paying himself and other insiders excessive compensation; (ii) causing BGP to pay hundreds of thousands of his personal expenses; (iii) engaging in self-dealing; (iv) failing to comply with applicable tax laws regarding the filing of income and payroll taxes and the remitting of withheld taxes; (v) commingling funds of BGP with funds of another entity he controlled and failing to adequately account for their disposition; and (vi) deliberately failing to maintain records from which BGP's financial condition could be ascertained.

The Trustee additionally seeks to recover as fraudulent transfers certain payments made to Casey, entities controlled by Casey and payments made for the benefit of Casey's wife, Gayle Casey.

To secure the judgment that the Trustee seeks to obtain, the Trustee seeks certain prejudgment relief, including injunctive relief against Casey, Casey Summit and the Reach and Apply Defendants to maintain the status quo.

## I.    PARTIES AND JURISDICTION

1.      The Plaintiff is Gary W. Cruickshank, as he is the duly appointed and acting chapter 7 Trustee for the Estate of Boston Grand Prix, LLC, a Massachusetts limited liability corporation. The Trustee maintains a place of business at 21 Custom House Street, Suite 920, Boston, Massachusetts.

718136v1/6727-001

2.      The Defendant John Casey is an individual residing at 22 Hood Farm, Boxford, Massachusetts (the "Boxford Property").

3.      The Defendant and Reach and Apply Defendant Casey Summit, LLC is a Massachusetts Limited Liability Company with a place of business at 435 Newbury Street, Danvers, MA 01923.  Casey is the sole member of Casey Summit, LLC.

4.      The Defendant and Reach and Apply Defendant Laser Leasing, Inc. d/b/a Aesthetic Laser Exchange is a Delaware corporation with a place of business at 430 Boston Street, Topsfield, Massachusetts.  Casey is the President, Treasurer, Director, Clerk and Registered Agent of Laser Leasing, Inc., and upon information and belief, Casey is the sole shareholder of Laser Leasing, Inc.

5.      The Defendant and Reach and Apply Defendant Aesthetic Medical Lasers, LLC is a Colorado Limited Liability Company with a place of business at 8434 S. Oak Ct., Littleton, CO 80127.

6.      The Defendant Gayle Casey ("Mrs. Casey") is an individual residing at the Boxford Property, and is the wife of Casey.

7.      Trustee Process Defendant Bank of America Corporation is a banking institution that operates Bank of America branch networks in over 4,700 locations. Upon information and belief, Bank of America Corporation operates its principal office located at 100 N Tryon Street, Charlotte, North Carolina. Upon information and belief, Bank of America Corporation operates its principal office in Massachusetts at Bank of America, 315 Washington Street, Boston, Massachusetts.

8.      Trustee Process Defendant Citizens Bank of Massachusetts is a trust company with its principal office located at 28 State Street, Boston, Massachusetts.

9.    Trustee Process Defendant Leader Bancorp, Inc. is a domestic profit corporation with its principal office at 180 Massachusetts Avenue, Arlington, Massachusetts.

10.    Trustee Process Defendant People's United Financial, Inc. is a foreign corporation with its principal office located at 850 Main Street, Bridgeport, Connecticut. People's United Financial, Inc. maintains a registered agent office located at National Corporate Research, Ltd., 44 School Street, Suite 325, Boston, Massachusetts.

11.    Trustee Process Defendant TD Bank, N.A. is a subsidiary of Canada's Toronto-Dominion Bank and operates more than 1,300 TD Bank branches. Upon information and belief, TD Bank, N.A. maintains its principal office at 1701 Marlton Pike E #200, Cherry Hill, New Jersey.

12.    Trustee Process Defendant Santander Holdings USA, Inc. is a foreign corporation with its principal office located at 75 State Street, Boston, Massachusetts. Santander Holdings USA, Inc. maintains a registered agent office located at Corporation Service Company, 84 State Street, Boston, Massachusetts.

13.    Trustee Process Defendant UBS Financial Services, Inc. is a foreign corporation with its principal office located at 1200 Harbor Boulevard, Weehawken, New Jersey. UBS Financial Services, Inc. maintains a registered agent office located at Corporation Service Company, 84 State Street, Boston, Massachusetts.

14.    Trustee Process Defendant FMR, LLC d/b/a Fidelity Investments is a financial services institution. Upon information and belief, FMR, LLC operates its principal office at 245 Summer Street, Boston, Massachusetts. FMR, LLC d/b/a Fidelity Investments maintains a registered agent office located at CT Corporation System, 155 Federal Street, Suite 700, Boston, Massachusetts.

718136v1/6727-001

15.     Trustee Process Defendant Prudential Financial, Inc. is an insurance and investment firm with its principal office located at 751 Broad Street, Newark, New Jersey.

16.     Trustee Process Defendant Janney Montgomery Scott, LLC is a foreign limited liability company with its principal office located at 1717 Arch Street, Philadelphia, Pennsylvania. Janney Montgomery Scott, LLC maintains a registered agent office located at CT Corporation System, 155 Federal Street, Suite 700, Boston, Massachusetts.

17.     Trustee Process Defendant Sterling Bancorp is the holding company for Sterling National Bank. Upon information and belief, Sterling Bancorp operates its principal office at 400 Rella Boulevard, Montebello, New York.

18.     Raymond James & Associates, Inc. is an investment firm with its principal place of business located at 880 Carillon Parkway, St. Petersburg, Florida. Raymond James & Associates, Inc. maintains a registered agent office at CT Corporation System, 155 Federal Street, Suite 700, Boston, Massachusetts.

19.     Reach and Apply Defendant Catherine M. Casey is the Trustee of the 36 Ellery Street Nominee Trust (the "Ellery Street Trust"), which is a trust established pursuant to a Declaration of Trust dated January 15, 1998 and recorded with the Middlesex County Registry of Deeds at Book 28104, Page 18.   Catherine M. Casey resides at 36 Ellery Street, Cambridge, Massachusetts.

20.     Reach and Apply Defendant Catherine M. Casey is the Trustee of the Casey Family Trust (the "Family Trust"), which is a trust established pursuant to a Declaration of Trust dated January 15, 1998.  Catherine M. Casey resides at 36 Ellery Street, Cambridge, Massachusetts.

21.     Jurisdiction of this Court is founded upon 28 U.S.C. § 157.

718136v1/6727-001

22.     Venue is proper within this district pursuant to 28 U.S.C. §1409.

23.     This is a core proceeding pursuant to 28 U.S.C. §157 (b)(2)(A), (H), and (O).

## II.     FACTUAL STATEMENT

### A.     CASE BACKGROUND

24.     On July 5, 2016 (the "Petition Date"), BGP commenced this case by filing a voluntary Chapter 7 bankruptcy petition.

25.     Gary W. Cruickshank was thereafter duly appointed as the Chapter 7 Trustee.

26.     Subsequent to his appointment, the Trustee conducted a public auction sale of the personal property of BGP, which sale generated gross proceeds of $35,100, and collected $10,971.81 in cash from the Debtor's bank accounts and $1,086.03 in insurance refunds.

27.     The bar date in this case has passed, and unsecured claims in this case total in excess of $11 million after accounting for monies paid to ticket holders from funds paid to the Attorney General by IndyCar, LLC.

28.     On or about October 6, 2016, the Trustee employed Steven Gabovitch ("Gabovitch") as his accountant to assist him with his review of the financial affairs of the company.  Filed contemporaneously herewith is the *Affidavit of Steven Gabovitch* detailing Gabovitch' findings following his inspection of, among other things, the bank statements of the Debtor, certain other documents prepared by Casey, and his discussion with Casey.

### B.     DEBTOR BACKGROUND

29.     BGP was organized under the laws of the state of Massachusetts on or about April 26, 2012.  Mark Perrone ("Perrone") was the founder of BGP and the Chief Executive Officer of BGP until he resigned on or about December 28, 2015.  On or about that time, Perrone became a consultant to BGP through his consulting company, Sportserve.

718136v1/6727-001

30.     On or about April of 2015, BGP entered into an Event Agreement with IndyCar LLC which provided for BGP to operate an IndyCar Series event for a period of five years.  In 2016, BGP entered into a License Agreement with the City of Boston that provided, among other things, for BGP to operate an automobile race in the City of Boston for a minimum of five years.

31.     According to the Debtor's Executive Summary prepared by Casey for presentation to potential investors, "[a] racetrack will be constructed on the South Boston Waterfront which consists of a 2.2 mile length that encircles the Boston Convention Center. The race will be run on each Labor Day weekend with on-track events being held from 9:00am - 6:00 Friday through Sunday. Several off-track events will take place both night and day which include, concerts, fireworks, family fun-zones, art exhibits, Beer festivals, Auto auctions, classic car shows, and more events to be added." *Boston Grand Prix, LLC Executive Summary* (the "Executive Summary"), ¶ 4.  A copy of the Executive Summary is attached hereto as Exhibit A.

32.     BGP sought to raise four million dollars "through a private offering with the proceeds to fund the upfront costs associated with building a track and its ancillary expenses. The revenue generated from the event will come from Sponsorships, Hospitality sales, ticket sales, and other ancillary income**."** *Executive Summary*, ¶ 6.

33.     Revenue estimates in the Debtor's business plan were as follows: (i) ticket sales expected to generate a minimum of $1 million; (ii) sponsorship sales expected to generate over $10 million in both cash and trade services; and (iii) hospitality sales expected to generate $3.3 million. *Executive Summary*, *Business Plan*, ¶¶ 7-9.

718136v1/6727-001

### C.    JOHN CASEY'S ROLE AT BOSTON GRAND PRIX

34.     Casey was the Chief Financial Officer of BGP from January 1, 2015 until his resignation in June of 2016.  He was one of two managing members of BGP and became the sole managing member after Perrone resigned as managing member on February 1, 2016.

35.     Casey Summit, LLC ("Casey Summit"), an entity in which Casey is the sole manager and member, became the Chief Executive Officer of BGP commencing on December 28, 2015 until he resigned in June of 2016.

36.     Casey Summit's appointment as CEO by BGP was retroactive to September 1, 2015.  For all intents and purposes, Casey had been acting as CEO since September 1, 2015.

37.     Casey considers himself and Casey Summit, LLC to be one and the same.

38.     During all relevant times herein, Casey was the person in control of the operations of the Debtor.

39.     Casey is a Certified Public Accountant who earned an undergraduate degree in accounting from Boston College and a Masters of Business Administration in International Finance from Babson College.

40.     According to John Casey's biography prepared in connection with his work at BGP, he brought "30 years of business entrepreneurship and tremendous organizational and administrative skills to the team. John became a CPA working for Deloitte Haskins and Sells, after which he embarked on a career in banking with brought him to loan officer positions at Bank Boston and USTrust. While at USTrust, he discovered the high growth opportunities in the Medical Device industry and joined one of his clients in a senior financial capacity. He shortly spun himself off and founded a medical device leasing company that went on to gross in excess of $1BM over the next several years. After investing in medical device manufacturers and small

718136v1/6727-001

pharmaceutical start-ups. John managed to sell of all his businesses and took an early retirement

until the exciting opportunity of BGP came along." *Executive Summary*, *Management Team,* ¶

8.

**D.    JOHN CASEY'S INADEQUATE RECORD KEEPING IS PART OF A SCHEME TO CONCEAL LOOTING FROM BGP**

41.     Casey maintained wholly inadequate records for BGP as part of his scheme to

conceal his looting of hundreds of thousands of dollars of BGP's funds.

42.     BGP maintained three principal bank accounts: (i) a Citizens Bank account under

the name of "Boston Grand Prix, LLC", with an account number ending 3239 (the "Citizens

Account"); (ii) a Leader Bank account entitled "Boston Grand Prix, LLC/John Casey/Tickets,"

with an account number ending 8117; and (iii) a Leader Bank account entitled "Boston Grand

Prix, LLC/John Casey/Merchandise," with an account number ending 8109.

43.     Casey was the sole signatory on the two Leader Bank accounts and one of two

signatories, along with Perrone, on the Citizens Account.  No debit or ATM cards were issued

for the two Leader bank accounts. While Casey and Perrone each were signatories on the

Citizens Account, only Casey signed checks from the Citizens Account.  Casey testified that both

he and Perrone were in possession of a debit card for the Citizens Account.

44.     For a business enterprise of the magnitude of BGP which was attempting to raise

millions of dollars from investors and sponsors, it would be reasonable to expect that BGP would

maintain a double entry (i.e., debits and credits) set of books and records consisting, at a

minimum, of: (i) a cash receipts journal, (ii) a cash disbursements journal, (iii) a general ledger,

and (iv) monthly bank reconciliation worksheets. These records could be created relatively easily

with the use of inexpensive bookkeeping software.  A company maintaining these records would

be able to produce: (i) a trial balance worksheet, which consists of a list of each general ledger

account and its balance on a given date, organized by debit and credit columns, totaled and

shown to be equal, thereby proving the books are in balance; (ii) a balance sheet, (iii) an income

statement, and (iv) payroll records.

45.    Despite the fact that Casey, a trained CPA with extensive experience, anticipated

that millions of dollars would flow through the bank accounts of the Debtor, he operated BGP

without maintaining books and records. Casey never hired a bookkeeper for the Debtor or even

purchased bookkeeping software to track the Debtor's income and expenses. Casey testified that

he kept track of accounts payable in his head.

46.    The sole record that Casey has provided with respect to BGP's income and

expenses is a single excel spreadsheet entitled "Trial Balance" (the "Casey Accounting"),

attached hereto as Exhibit A and incorporated herein.

47.    The Casey Accounting is woefully inadequate to serve as a business record. The

Casey Accounting is not a trial balance or a cash receipts or disbursement journal. The Casey

Accounting: (i) contains figures with no dates, check numbers or other identifying information,

(ii) does not differentiate between BGP's three bank accounts, (iii) does not include all receipts

and disbursements contained in the BGP bank statements, (iv) fails to account for hundreds of

ATM and debit card transactions in the Citizens Account; and (v) is not in balance.

48.    Contrary to Casey's testimony that the Casey Accounting was updated regularly

and that he used it to reconcile the bank statements for BGP each month, the Casey Accounting

was not created until May 14, 2016, after the race was cancelled. Furthermore, the Casey

Accounting could not have been used to reconcile BGP's bank statements because it: (i) does not

differentiate between the three BGP bank accounts, (ii) does not list individual checks or check

numbers, (iii) does not contain dates, (iv) does not contain cash balances, (v) makes no reference

to any bank statement cash balances, and (v) does not contain any notations indicating checks and disbursements have cleared the bank account.  In addition, the total of the disbursements in the Casey Accounting is $5,672,915.09, which is $328,360.26 less than the total of the disbursements in BGP's bank statements. The total of receipts in the Casey Accounting is $5,734,311.47, which is $277,076.04 less than the $6,011,387.51 total receipts in BGP's bank statements.  The Casey Accounting is an after-the-fact attempt to recreate a summary of BGP's receipts and disbursements.

49.     In light of Casey's training as a CPA and his extensive experience in accounting and financing, it is reasonable to expect that Casey would have caused BGP to maintain adequate records to prepare financial statements, federal and state income and payroll tax returns, and to allow an independent third party, such as an investor or tax auditor, to track BGP's income and expenses.  No such records have been produced and no explanation for the lack of records has been provided by Casey for their absence. It is reasonable to infer that the lack of records was intentional on Casey's part to hide his misconduct.

50.     In addition to failing to maintain adequate books and records for BGP, Casey failed to ensure BGP's compliance with applicable income, payroll and tax laws, thereby exposing BGP and/or its members, including himself, to potential tax liabilities, penalties and interest.  For example, Casey appears to have withheld income, Social Security and Medicare taxes from employee wages, but has not provided any detail explaining which types of taxes and corresponding amounts were withheld, nor has he remitted any of the withheld taxes to any taxing authority. As a result, BGP's employees must reconstruct their gross wages and withholdings. The Trustee has requested a breakdown of the withholding from Casey to provide to the employees but has received no response.   Casey acknowledged that he never caused BGP

to file with federal or state taxing authorities any monthly, quarterly or annual payroll tax

returns, 1099s, W-3s or W-2s.  Casey has also acknowledged that in addition to not paying over

the employee's share of withheld taxes, he did not cause BGP to pay any of the employer's share

of federal or state unemployment taxes and did not register BGP with the Massachusetts Division

of Unemployment Assistance.  There is no evidence of payments for any workers compensation

insurance for BGP's employees. Casey did not prepare, or hire anyone to prepare, any income

tax returns for BGP.

**E.     CASEY CAUSED BOSTON GRAND PRIX, LLC'S TO PAY HIM EXCESSIVE COMPENSATION**

51.     The compensation paid to Casey and Casey Summit by BGP was excessive.

52.     A summary of the Debtor's disbursements from its three bank accounts

(the "Disbursements Detail") for the period from February 5, 2015 through May 31, 2016 is

attached hereto as Exhibit B and incorporated herein.

53.     As is set forth in the Disbursements Detail, the Debtor has made approximately $6

million in disbursements during the sixteen month period from February 5, 2015 through May of

2016.

54.     Included in the Disbursements Detail are BGP's payments of $155,854.27 to

American Express and $142,896.64 to Chase, for a total of $298,750.91, to pay for the charges

made on Casey's personal credit cards. From September 2015 through May 2016, BGP paid all

charges on Casey's personal American Express and Chase credit cards, regardless of whether the

charges were personal or business related. No evidence has been provided, and in fact, no

contemporaneous records exist, to provide substantiation of the purported business purpose of

the charges.

55.     Casey did not reimburse BGP for payment of his personal expenses, but instead "counted" these amounts as his compensation; however, he did not cause BGP to issue him a W-2 or 1099 so that he could report this compensation to the IRS. Because of the lack of contemporaneous records to substantiate the business nature of the charges, it is impossible to substantiate whether any or all of these charges were actually business expenses or Mr. Casey's personal expenses or to prepare accurate books and records or tax returns for the Debtor.

56.     Casey and Casey Summit were parties to employment contracts with BGP that provided for Casey to receive $4,000 per month as CFO and for Casey Summit, LLC to receive $35,000 per month as CEO.  Each contract also provided for Casey to receive a car allowance and health insurance.

57.     Casey has acknowledged that BGP paid $608,166 in the aggregate to him, entities controlled by him, and to third parties on his behalf.  In fact, however, BGP paid Casey not less than $948,992.59, consisting of $85,000 paid to him directly, $535,016.07 paid to entities controlled by him, and $328,476.52 paid to third parties for his personal benefit.  A chart (the "Casey Compensation Summary") setting forth the amounts paid to Casey, to other entities controlled by Casey, and to third parties on Casey's behalf is attached hereto as Exhibit C and incorporated herein.

58.     Examples of payments made by BGP on Casey's behalf or to entities he controlled as set forth on the Casey Compensation Summary include the following:

(i)      a $22,172.62 to Herb Chambers Porsche as a down payment on the Porsche Cayenne that Casey still drives and at least $4,988.89 paid to Porsche Financial Services, the company that financed the purchase of the Porsche.

(ii)     $488,614.64 to Casey's wholly owned entity, Casey Summit (the "Casey Summit Payments").

(iii)     $124,391.90 in charges made on Casey's personal credit cards with American Express, Chase and Bank of America that were paid by BGP and for which Casey has acknowledged were personal in nature, including $60,846.86 in payments to Bank of America, one of John Casey's personal credit cards paid by BGP and which credit card he conceded was used solely for personal expenses.

(iv)     $92,222.83 paid to People's United Bank (the "Home Mortgage Payments") on account of a mortgage or mortgages given on the Boxford Property, which is Casey's home but which is titled in the name of his wife, Gayle Casey, including $49,657.80 of which was paid directly from a BGP account and $43,565.03 of which was paid from the Casey Summit Account (defined below) immediately following the deposit of the Transferred Funds (defined below).

(v)     $21,401.43 to Laser Leasing, Inc. ("Laser Leasing"), a corporation controlled by John Casey (the "Laser Leasing Payments").

(vi)     $25,000 to Aesthetic Medical Lasers, LLC ("Aesthetic Medical"), which, upon information and belief, is a limited liability company in which John Casey holds a controlling interest (the "Aesthetic Medical Payments").

(vii)     $27,300 to Dedicated Commercial Recovery, for payments of a debt owed by Casey/and or his entity Laser Leasing and not by the Debtor.

(viii)     $10,000 to Reading Co-operative Bank, on account of a debt owed by Casey and not by the Debtor.

(ix)     $20,000 to Coast to Coast Automobile, paid as a down payment for a 2014 BMW M6 that Casey purchased for his son, plus at least $2,603.04 to Ally Bank for loan payments made for the BMW.

(x)     $9,288.68 to Sterling Bank to pay personal expenses.

(xi)     $6,618.64 to Tom James Co. to pay for suits.

(xii)     $10,200 in rent payments paid to a landlord for an apartment BGP rented but never used, and $4,250 as a broker's fee to Charlesgate Realty for locating the apartment.

59.     BGP's bank records reflect $862,580.15 in disbursements by BGP

(the "Undocumented Disbursements") for which the Trustee has received no supporting

information, including: (i) at least $117,306,59 in cash withdrawals from the Citizens Account,

(ii) $15,096.46 in disbursements to unknown or unidentified payees, (iii) $67,154.63 in illegible

checks written from BGP accounts, (iv) $211,366.45 in ATM withdrawals and debit card charges

from the Citizens Account, (v) $255,291.82 in charges on Casey's personal American Express

and Chase credit cards which were purportedly for business expenses and for which Casey has

provided no supporting information, and (vi) a $195,000 wire transfer from Casey Summit from

the Transferred Funds, which Casey contends was for the benefit of BGP, but for which the

Trustee has seen no verifying information.  A detailed breakdown of the Undocumented

Disbursements is attached hereto as Exhibit D and incorporated herein.

60.    Included in the Undocumented Disbursements are at least $117,305.75 in cash

withdrawals for which no documentation or business purpose have been provided, and upon

information and belief, for which no such documentation exists. Upon information and belief, a

portion or all of the cash withdrawals had no business purpose but were withdrawn to pay

Casey's personal expenses or the expenses of friends of Casey.

61.    Also included in the Undocumented Disbursements are hundreds of unaccounted

for ATM and debit charges from the Citizens Account totaling in excess of $210,000 for, among

other things, restaurants, hotels, airfare, and concert tickets.  No records have been produced to

substantiate the business purpose of these charges, and upon information and belief, no such

records exist.  Upon information and belief, at least a portion of the debit charges, including

certain charges for hotels and concert tickets, were not made for business purposes but were

personal to Casey.

62.    The Trustee has requested supporting documents from Casey for, among other

things, the Undocumented Disbursements, but no documents have been provided.

63.    Without contemporaneous documents substantiating the business purpose of the

Undocumented Disbursements, it is reasonable to assume that these payments are personal, not

business related, and could be payments made to or for the benefit of Casey or his related

entities, thereby increasing the total amount paid to him to at least $1,811,575.74.

64.    Between May 2, 2016 and May 6, 2016, after the race had been cancelled and

while BGP owed millions of dollars to creditors, Casey caused not less than $630,000 of the

Debtor's funds to be transferred (the "Transferred Funds") to an account maintained by Casey

Summit at Citizens Bank (the "Casey Summit Account"), thereby commingling funds of the

Debtor with the funds of Casey Summit, an entity controlled by Casey.

65.    To date, the only document received from Mr. Casey with respect to the

Transferred Funds (the "Transferred Funds Summary") is an informal list of amounts, mostly in

round numbers, some of which contain shorthand references to purported payees, others which

reference only a purpose, such as "Attorney Fees," purportedly for the benefit of BGP.  A copy

of the Transferred Funds Summary is attached hereto as Exhibit E and incorporated by reference.

The Transferred Funds Summary does not include a Casey Summit Account check number, wire

transfer reference or other identifying information.  There is no audit trail from which to trace the

amounts to their original source documents. No receipts or invoices from the payees have been

provided.  There is no indication of the business purpose of each payment.  Only three of the line

items contained in the Transferred Funds Summary match payments made from the Casey

Summit Account.   Casey has failed to provide any documentation or substantiation for

$313,404.97 of the Transferred Funds.

66.    On May 1, 2016, prior to the deposit of the Transferred Funds, the Casey Summit

Account had a balance of $4,257.57.  Disbursements from the Casey Summit Account in May of

2016 included but are not limited to the following:

(i)     $43,565.03 paid in two checks, on May 6, 2016 and May 10, 2016, to People's United Bank, which holds two mortgages on Casey's home, which is titled in the name of his wife.

(ii)    $195,000 wired to Versant Funding, purportedly to reimburse Versant in connection with Casey's cancellation of a contract between Versant and BGP providing for the factoring of BGP receivables; however, there is no documentation demonstrating that this payment was a debt of BGP and not another entity controlled by Casey.

(iii)   $100,000 wire transfer for which there is no identifying information, which appears to have been wired back to BGP and then wired to Fundraise. A member of BGP holds an interest in Fundraise.

(iv)    $150,000 paid on May 18, 2016 to Casey Summit and apparently deposited to another account controlled by Casey Summit.

(v)     $21,595.03 to Chase, one of Casey's personal credit cards.

(vi)    $4,000 paid to Jones, Waldo, a law firm that Casey not BGP had engaged.

(vii)   $55,000 paid in May and June of 2016 to K&L Gates, after K&L Gates no longer represented BGP.  K&L Gates represented BGP from January 2016 until April of 2016 and then represented Casey personally beginning in May of 2016.

(viii)  $6,000 to Amie Galuszwski, who was, upon information and belief, a personal friend for whom Casey agreed to purchase a Toyota Sequoia.

(ix)    $2,000 in cash withdrawals.

(x)     $3,669.06 wired to Sterling National Bank, which, upon information and belief, was a payment on behalf of Casey or Casey Summit.

(xi)    $3,900 wired to Dedicated Commercial Recovery, which, upon information and belief, was a payment of a debt of Casey, Casey Summit or Laser Leasing.

## F.  CASEY'S ENGAGED IN SELF-DEALING

67.     During Casey's tenure as managing member, officer and person in control of BGP, Casey engaged in self-dealing.

68.     As an example, Casey, the sole member of Casey Summit, caused BGP to enter into a consulting contract with Casey Summit and to pay or transfer to Casey Summit at least

718136v1/6727-001

$488,614.64 during the approximately nine month period that it operated as CEO of the

company.  Casey caused BGP to make payments with no business purpose to other entities that

Casey controlled, Laser Leasing and Aesthetic.

69.     Other examples of Casey's self-dealing include the following:

(i)     Casey provided the Debtor with four to five vehicles owned by Laser
Leasing to be utilized by the Debtor.  No documents governing these
transactions exist.  Casey caused BGP to pay both the loan payments for
the vehicles and the shortfall on the loans after the vehicles were sold,
including:  (a) a 2013 Mercedes ML350 driven by Perrone and financed
by Chase Auto; (b) a 2013 Ford 150 financed by Chrysler (c) a ProMaster
Van 2014 financed by Chase Auto; and (d) a 2013 Infinity G37 used by
Tony Cotman, a member of BGP, and financed by Bank of America.

(ii)    BGP used a pickup truck owned by Laser Leasing and then on September
10, 2015, paid $31,000 to North Shore Bank to pay off the loan against the
pickup truck.  No documentation exists with respect to this transaction.

(iii)   As has been set forth in detail above, Casey transferred $630,000 to the
Casey Summit Account in May of 2016, after the race was cancelled. The
Transferred Funds were co-mingled with the funds of Casey Summit.
From the $630,000 in remaining funds available at a time when creditors
were owed millions, Casey primarily made payments that directly or
indirectly benefitted himself.

(iv)    Upon information and belief, Casey used BGP's funds to pay for concerts
attended by family and friends.

(v)     Upon information and belief, Casey provided the Citizens Account debit
card information to a friend to charge their upcoming stay at Canyon
Ranch that did not have a business purpose, and regularly used funds of
BGP to pay for hotel rooms with no business purpose.

(vi)    Upon information and belief, Casey created a gift letter on behalf of the
same friend in the amount of $200,000 that contained the banking
information from the Citizens Account.  Upon information and belief,
prior to the creation date of the gift letter, Casey encouraged his friend to
purchase a home.

(vii)   Casey caused BGP to purchase a 2014 BWM M6 for his son from a
dealership in Indianapolis for a purchase price of $84,989.38, including
tax, and arranged for it to be shipped to Massachusetts. Casey caused BGP
to pay a $20,000 down payment towards the purchase and at least

$2,603.04 in loan payments. Casey subsequently sold the BMW and has not accounted for the proceeds. Despite the fact that the vehicle sold after the Petition Date, it was not listed as an asset on the Debtor's schedules of assets and liabilities.

**G.   THE AGGREGATE COMPENSATION PAID TO MEMBERS OF BOSTON GRAND PRIX WAS EXCESSIVE**

70.   In addition to the payments received by Casey and his affiliates or by third parties for the benefit of Casey set forth above, BGP paid at least $653,374.53 to or for the benefit of other members of BGP or the entities that BGP members control, for what has been characterized as consulting fees. Despite Casey's characterization of these payments as consulting fees, he has produced no invoices from these consultants and no IRS form 1099s were prepared, filed with the taxing authorities or delivered to the payees.

71.   BGP had at least six members who did not invest funds in BGP, including (i) John Casey and/or his entity Casey Summit, (ii) Mark Perrone and/or his entity Sportserve, (iii) Michael Morris and/or his entities Outside In Advisors and Outside In Strategies, LLC, (iv) Tony Cotman and/or his entity NZR Consulting, (v) Dan Passacantilli and/or his entity DS Consulting and (vi) Chris Keohane and/or his entity CK Stratagies.  Casey testified had these members had not invested no funds in the Debtor but held an interest based upon "sweat equity."  Other members of BGP invested funds in BGP.

72.   Not including Casey and Casey Summit, a summary of payments (the "Other Members' Compensation") to the other so-called "sweat equity" members detailing the payee, dates and amounts paid is attached hereto as Exhibit F and incorporated herein.

73.   The Other Members' Compensation includes amounts paid on behalf of Mark Perrone ("Perrone"), the former CEO turned business consultant to BGP, including but not limited to a $100,000 payment to Raymond James & Associates for an investment by Perrone;

$8,321.54 in payments to AT&T for Perrone's personal telephone charges; a $6,104.96 payment

to the Massachusetts Department of Revenue to pay Perrone's back taxes; a $5,015 to Meybohm,

LLC for Perrone to purchase land in Georgia; and payments to other third parties on Perrone's

behalf.

74.     Casey has caused BGP to pay other members of the Debtor, individually or

through an entity such member controlled, including:  (i) $115,500 to Chris Keohan and his

entity CK Strategies, for lobbying and community outreach services; (ii) $64,526.35 to Michael

Morris and his entities Outside in Advisors and Outside in Strategies, LLC, for consulting and

in-house counsel services; (iii) $166,000 to Tony Cotman and his entity NZR Consulting, for

engineering services; and (iv) $40,000 paid to Dan Passacantilli and his entity DS Consulting, for

lobbying services.

75.     The payments of the Other Members' Compensation constitute distributions to

members from an insolvent company.

**H.     CASEY'S RELATIONSHIP WITH THE DEBTOR**

76.     At all relevant times herein, Casey maintained pervasive control over the Debtor.

77.     Casey, as managing member, officer and person in control of the Debtor, caused

intermingling of the activities and operations of BGP and his personal affairs by causing BGP to

pay entities he controlled without a business purpose and to pay third parties for his personal

benefit.  Among other things, BGP did not maintain company credit cards but purportedly used

Casey's personal credit cards to charge business debt, and BGP paid all of the charges,

regardless of whether they were business or personal.  No substantiating records exist to support

the business purpose of any of the charges.

718136v1/6727-001

78.     Casey, as managing member and person in control of BGP, failed to observe appropriate formalities and caused BGP to simply function as a façade or alter ego of Casey.

79.     Casey, as managing member and person in control of BFP, failed to respect BGP as a separate legal and taxable entity, but instead treated BGP's funds as his own and consistently used them for his personal benefit.

80.     Casey, as managing member and person in control of BGP, failed to maintain business records so that the flow of funds for his personal benefit could be traced.

81.     Casey, as managing member and person in control of BGP, wrongfully and systematically diverted assets from BGP for his personal benefit.

82.     At all relevant times herein, BGP was insolvent.

83.     The Debtor has been undercapitalized since its formation.

84.     At all relevant times, the Debtor had no ability to pay its debts as they became due.

85.     At all relevant times, the Debtor had no real tangible assets other than the cash it raised from investors and sponsors.

86.     When including the Undocumented Disbursements and the Other Members' Compensation, Casey has caused insiders of BGP, including himself and Casey Summit, to be paid at least $2,464,947.27, which amount represents approximately 41% of the $6,001,275.35 in funds disbursed by BGP.

87.     Casey, as the person in control of BGP, used the corporation to perpetrate a fraud upon its creditors.

88.     Casey's actions of Casey deprived the Debtor of necessary capital for its operations and caused the Debtor's financial condition to deteriorate significantly.

718136v1/6727-001

### COUNT I
#### AGAINST CASEY AND CASEY SUMMIT FOR AVOIDANCE OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 548, 550 AND 551

89.     The Trustee repeats and reasserts the allegations contained in the paragraphs above and by reference incorporates them herein.

90.     All payments of compensation to Casey and Casey Summit, including all payments made for the benefit of Casey, entities controlled by Casey, and the Undocumented Disbursements (collectively, the "Casey Compensation") were paid within two years of the Petition Date.

91.     The payments of the Casey Compensation constituted transfers of an interest of the Debtor.

92.     The Casey Compensation was paid with actual intent to hinder, delay, or defraud creditors to which the Debtor was or became indebted.

93.     The payments of the Casey Compensation may be avoided by the Trustee as fraudulent transfers pursuant to the provisions of 11 U.S.C. §548(a)(1)(A) and preserved for the Estate pursuant to the provisions of 11 U.S.C. §§550 and 551.

### COUNT II
#### AGAINST CASEY AND CASEY SUMMIT FOR AVOIDANCE OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 548, 550 AND 551

94.     The Trustee repeats and reasserts the allegations contained in the paragraphs above and by reference incorporates them herein.

95.     All payments of compensation to Casey and Casey Summit, including all payments made for the benefit of Casey, entities controlled by Casey, and the Undocumented Disbursements (collectively, the "Casey Compensation") were paid within two years of the Petition Date.

718136v1/6727-001

96.     The Debtor received less than reasonably equivalent value in exchange for payments of the Casey Compensation.

97.     The payments of the Casey Compensation constituted transfers of an interest of the Debtor.

98.     At the time the Casey Compensation was paid to Casey and Casey Summit and/or on behalf of Casey, the Debtor was insolvent or became insolvent as a result of the payments of the Casey Compensation.

99.     At the time the payments of the Casey Compensation were made, the Debtor was engaged in a business for which any property remaining was an unreasonably small capital.

100.    At the time the Casey Compensation was paid by the Debtor, the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

101.    The payments of the Casey Compensation may be avoided by the Trustee as fraudulent transfers pursuant to the provisions of 11 U.S.C. §548(a)(1)(B) and preserved for the Estate pursuant to the provisions of 11 U.S.C. §§550 and 551.

## COUNT III
### AGAINST CASEY FOR BREACH OF FIDUCIARY DUTIES OF CARE, LOYALTY AND GOOD FAITH

102.    The Trustee repeats and reasserts the allegations contained in the paragraphs above and by reference incorporates them herein.

103.    Casey, a managing member, officer, and person in control of the Debtor, at all relevant times owed fiduciary duties of care, loyalty and good faith to BGP under applicable Massachusetts law.

104.    As such, Casey had an obligation: (i) to exercise due care and diligence in the management and administration of BGP and in the use and preservation of BGP's property,

funds and assets; and (ii) to ensure that BGP did not engage in any unsound management and investment practices.

105.    Casey also had an obligation (i) to deal fairly and honestly with BGP; (ii) to act in a responsible and lawful manner, with undivided loyalty; and (iii) to ensure that BGP did not engage in any unsound management and investment practices.

106.    Casey breached his fiduciary duties of care, loyalty and good faith to BGP by causing the intermingling of the activities and operations of BGP and his personal affairs, causing BGP to pay entities he controlled without a business purpose and causing BGP to pay third parties for his personal benefit.

107.    Casey breached his fiduciary duties of care, loyalty and good faith to BGP by causing BGP to fail to observe appropriate formalities and to function his façade or alter ego.

108.    Casey breached his fiduciary duties of care, loyalty and good faith to BGP by causing BFP to pay its funds for Casey's personal purposes without restriction and without substantiating documents.

109.    Casey breached his fiduciary duties of care, loyalty and good faith to BGP by failing to respect BGP as a separate legal and taxable entity, but instead treating BGP's funds as his own and consistently using them for his personal benefit.

110.    Casey breached his fiduciary duties of care, loyalty and good faith to BGP by failing to maintain business records from which the flow of funds for his personal benefit could be traced.

111.    Casey breached his fiduciary duties of care, loyalty and good faith to BGP by causing BGP to pay the Casey Compensation, which was excessive.

718136v1/6727-001

112.     Casey breached his fiduciary duties of care, loyalty and good faith to BGP by causing BGP to pay the Casey Compensation when BGP was insolvent.

113.     Casey breached his fiduciary duties of care, loyalty and good faith by causing BGP to pay members of BGP in excessive amounts without proper documentation.

114.     Casey breached his fiduciary duties of care, loyalty and good faith by failing to maintain business records on behalf of BGP from which BGP's financial condition could be ascertained.

115.     The Trustee is entitled to a judgment against Casey for damages arising from his breach of his fiduciary duties of care, good faith and loyalty to BGP.

### COUNT IV
### AGAINST JOHN CASEY FOR DIRECTING DISTRIBUTIONS WHEN BGP WAS INSOLVENT

116.     The Trustee repeats and reasserts the allegations contained in the paragraphs above and by reference incorporates them herein.

117.     To the extent that the compensation paid to Casey and other members or their affiliates are found to be excessive, such payments constitute distributions to members while BGP was insolvent.

118.     As such, Casey is liable to BGP for such illegal distributions.

119.     The Trustee is entitled to a judgment against Casey

### COUNT V
### AGAINST JOHN CASEY TO PIERCE CORPORATE VEIL OF BGP

120.     The Trustee repeats and reasserts the allegations contained in the paragraphs above and by reference incorporates them herein.

718136v1/6727-001

121.   At all relevant times herein, Casey was a managing member, the CFO and the person in control of BGP.  From October of 2015 through June of 2016, Casey was also the CEO of BGP through Casey Summit, an entity he controlled.

122.   Casey exercised pervasive control of BGP.

123.   Casey caused intermingling of the activities and operations of BGP and his personal affairs by causing BGP to pay him excessive compensation, to pay his personal debts and to make direct payments to entities he controlled.

124.   At all relevant times herein, BGP was thinly capitalized.

125.   BGP, through which Casey operated, failed to observe appropriate formalities and simply functioned as a façade or alter ego of Casey.

126.   BGP, through which Casey operated, failed to maintain financial records.

127.   At all relevant times herein, BGP was insolvent.

128.   Casey wrongfully and systematically diverted assets from BGP.

129.   At all relevant times, BGP functioned as a sole proprietorship of Casey.

130.   Casey, as the person in control of BGP, repeatedly used BGP assets for his own personal expenses and diverted BGP funds to entities he controlled.

131.   Casey, as the person in control of BGP, used the corporation to perpetrate a fraud upon its creditors.

132.   The Trustee is entitled to a judgment piercing the corporate veil and holding Casey personally liable for the debts of BGP.

718136v1/6727-001

## COUNT VI
### AGAINST LASER LEASING, INC. FOR AVOIDANCE OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 548, 550 AND 551

133.    The Trustee repeats and reasserts the allegations contained in the paragraphs above and by reference incorporates them herein.

134.    The Laser Leasing Payments were paid within two years of the Petition Date.

135.    The Laser Leasing Payments constitute a transfer of an interest of the Debtor.

136.    The Laser Leasing payments were paid with actual intent to hinder, delay, or defraud creditors to which the Debtor was or became indebted.

137.    The Laser Leasing payments may be avoided by the Trustee as fraudulent transfers pursuant to the provisions of 11 U.S.C. §548(a)(1)(A) and preserved for the Estate pursuant to the provisions of 11 U.S.C. §§550 and 551.

## COUNT VII
### AGAINST LASER LEASING, INC. FOR AVOIDANCE OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 548, 550 AND 551

138.    The Trustee repeats and reasserts the allegations contained in the paragraphs above and by reference incorporates them herein.

139.    The Laser Leasing Payments were paid within two years of the Petition Date.

140.    The Debtor received less than reasonably equivalent value in exchange for the Laser Leasing Payments.

141.    At the time BGP made Laser Leasing Payments, the Debtor was insolvent or became insolvent as a result of the Laser Leasing Payments.

142.    At the time the Laser Leasing Payments were made, the Debtor was engaged in a business for which any property remaining was an unreasonably small capital.

718136v1/6727-001

143.    At the time the Laser Leasing Payments were paid by the Debtor, the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

144.    The Laser Leasing payments may be avoided by the Trustee as fraudulent transfers pursuant to the provisions of 11 U.S.C. §548(a)(1)(B) and preserved for the Estate pursuant to the provisions of 11 U.S.C. §§550 and 551.

### COUNT VIII
**AGAINST AESTHETIC MEDICAL LASERS, LLC FOR AVOIDANCE OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 548, 550 AND 551**

145.    The Trustee repeats and reasserts the allegations contained in the paragraphs above and by reference incorporates them herein.

146.    All of the Aesthetic Medical Payments were paid within two years of the Petition Date.

147.    The Aesthetic Medical Payments constitute a transfer of an interest of the Debtor.

148.    The Aesthetic Medical Payments were paid with actual intent to hinder, delay, or defraud creditors to which the Debtor was or became indebted.

149.    The Aesthetic Medical Payments may be avoided by the Trustee as fraudulent transfers pursuant to the provisions of 11 U.S.C. §548(a)(1)(A) and preserved for the Estate pursuant to the provisions of 11 U.S.C. §§550 and 551.

### COUNT IX
**AGAINST AESTHETIC MEDICAL LASERS, LLC FOR AVOIDANCE OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 548, 550 AND 551**

150.    The Trustee repeats and reasserts the allegations contained in the paragraphs above and by reference incorporates them herein.

718136v1/6727-001

151.    All of the Aesthetic Medical Payments were paid within two years of the Petition Date.

152.    The Aesthetic Medical Payments constitute a transfer of an interest of the Debtor.

153.    The Debtor received less than reasonably equivalent value in exchange for the Aesthetic Medical Payments.

154.    At the time BGP made Aesthetic Medical Payments, the Debtor was insolvent or became insolvent as a result of the Aesthetic Medical Payments

155.    At the time the Aesthetic Medical Payments were made, the Debtor was engaged in a business for which any property remaining was an unreasonably small capital.

156.    At the time the Aesthetic Medical Payments were made, the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

157.    The Aesthetic Medical Payments may be avoided by the Trustee as fraudulent transfers pursuant to the provisions of 11 U.S.C. §548(a)(1)(B) and preserved for the Estate pursuant to the provisions of 11 U.S.C. §§550 and 551.

### COUNT X
#### AGAINST GAYLE CASEY FOR AVOIDANCE OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 548, 550 AND 551

158.    The Trustee repeats and reasserts the allegations contained in the paragraphs above and by reference incorporates them herein.

159.    The Home Mortgage Payments were paid within two years of the Petition Date.

160.    The Home Mortgage Payments constitute a transfer of an interest of the Debtor.

161.    The Home Mortgage Payments were paid with actual intent to hinder, delay, or defraud creditors to which the Debtor was or became indebted.

718136v1/6727-001

162.    The Home Mortgage Payments were paid for the benefit of Mrs. Casey, who holds title to the Boxford Property.

163.    The Home Mortgage Payments may be avoided by the Trustee as fraudulent transfers pursuant to the provisions of 11 U.S.C. §548(a)(1)(A) and preserved for the Estate pursuant to the provisions of 11 U.S.C. §§550 and 551.

**COUNT XI**
**AGAINST GAYLE CASEY FOR AVOIDANCE OF FRAUDULENT TRANSFERS
PURSUANT TO 11 U.S.C. §§ 548, 550 AND 551**

164.    The Debtor received less than reasonably equivalent value in exchange for the Home Mortgage Payments.

165.    At the time BGP made Home Mortgage Payments, the Debtor was insolvent or became insolvent as a result of the Home Mortgage Payments.

166.    At the time the Home Mortgage Payments were made, the Debtor was engaged in a business for which any property remaining was an unreasonably small capital.

167.    At the time the Home Mortgage Payments were made, the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

168.    BGP's payment of the Home Mortgage Payments were made for the benefit of Mrs. Casey, who holds title to the Boxford Street Property.

169.    The Home Mortgage Payments may be avoided by the Trustee as fraudulent transfers pursuant to the provisions of 11 U.S.C. §548(a)(1)(B) and preserved for the Estate pursuant to the provisions of 11 U.S.C. §§550 and 551.

## COUNT XII
### (REACH AND APPLY JOHN CASEY)

The Trustee repeats and reasserts the allegations contained in the paragraphs above and by reference incorporates them herein.

170.   Casey's membership units in Casey Summit and Aesthetic cannot be attached in an action at law but may be reached and applied pursuant to G.L. c. 214 §3(7).

171.   Casey's shares in Laser cannot be attached in an action at law but may be reached and applied pursuant to G.L. c. 214 §3(7).

172.   Casey's interest in the Ellery Street Trust and the Family Trust cannot be attached in an action at law but may be reached and applied pursuant to G.L. c. 214 §3(8).

## COUNT XIII
### INJUNCTIVE RELIEF AGAINST THE REACH AND APPLY DEFENDANTS

173.   The Trustee repeats and reasserts the allegations contained in the paragraphs above and by reference incorporates them herein.

174.   Unless Casey Summit and Aesthetic (collectively, the "LLCs"), their respective members, agents, servants, and employees are restrained and enjoined from interfering with or in any way impeding the right of the Trustee to reach and apply Casey's units in the LLCs, the Trustee will suffer irreparable harm.

175.   Unless Laser Leasing, its respective members, agents, servants, and employees are restrained and enjoined from interfering with or in any way impeding the right of the Trustee to reach and apply Casey's shares in Laser Leasing, the Trustee will suffer irreparable harm.

176.   Unless the Ellery Street Trust and the Family Trust (collectively, the "Trusts"), their respective trustees, beneficiaries and respective successors and assigns are restrained and

718136v1/6727-001

enjoined from interfering with or in any way impeding the right of the Trustee to reach and apply

Casey's interests in the Trusts, the Trustee will suffer irreparable harm.

177.    Therefore, the Trustee is entitled to a preliminary injunction against: (a) the LLCs

to establish a lien on Casey's units in each of the LLCs and to restrain and enjoin the LLCs, their

respective members, agents, servants, and employees from in any way interfering with or

impeding the Trustee's rights to reach and apply Casey's rights in the LLC; (b) Laser Leasing to

establish a lien on Casey's shares in Laser Leasing and to restrain and enjoin Laser Leasing, its

respective members, agents, servants, and employees from in any way interfering with or

impeding the Trustee's rights to reach and apply Casey's shares in Laser Leasing and (c) the

Trusts to establish a lien on Casey's interests in each of the Trusts and to restrain and enjoin the

Trusts, their respective trustees, beneficiaries and successors and assigns from in any way

interfering with or impeding the Trustee's rights to reach and apply Casey's interests in the

Trusts.

## COUNT XIV
### INJUNCTIVE RELIEF AGAINST JOHN CASEY AND CASEY SUMMIT

178.    The Trustee repeats and reasserts the allegations contained in the paragraphs

above and by reference incorporates them herein.

179.    The Defendants Casey and Casey Summit have systematically looted the Debtor

of hundreds of thousands of dollars to the detriment of creditors, while Casey, as a managing

member and personal in control of the Debtor, has failed to maintain records from which a third

party could trace payments made to entities controlled by Casey or to third parties for the benefit

of Casey.

180.    Casey has indiscriminately used BGP's funds for personal purposes without

restriction and without substantiating documents, such that BGP was merely Casey's alter ego.

Casey as a managing member, officer and person in control of BGP, has breached his duties of care, loyalty and good faith to the Debtor.

181.    Among other things, Casey has used BGP funds to pay nearly $100,000 to the holder of the two mortgages on his home, which is titled in the name of Mrs. Casey.  Upon information and belief, Casey holds an equitable interest in the home.

182.    In light of the actions of Casey and Casey Summit, there is a real and likely risk that Casey and Casey Summit will dissipate or encumber their assets.

183.    There is a reasonable likelihood that the Trustee will be successful in obtaining a judgement in favor of the estate with respect to his claims against Casey and Casey Summit.

184.    If a preliminary injunction is not entered, there is a reasonable likelihood that Casey and Casey Summit will transfer, convey encumber or otherwise dispose of their assets.

185.    Unless the injunctive relief requested by the Trustee is granted, the Trustee will suffer irreparable harm because he may be unable to obtain satisfaction of his judgment.

186.    The harm that will be suffered by the Trustee if the injunctive relief is not granted substantially outweighs any harm to Casey and/or Casey Summit.

187.    Granting the injunction will not have any adverse effect on the public interest.

188.    Accordingly, the Trustee is entitled to injunctive relief restraining and enjoining the transfer Casey and Casey Summit and all persons in active concert with them from conveying, encumbering, transferring, selling or otherwise disposing of any of their assets pending a determination of the Trustee's claims against Casey and Casey Summit.

**WHEREFORE**,  Gary W. Cruickshank, as he is Trustee of the Estate of Boston Grand Prix, LLC respectfully prays that the Bankruptcy Court enter judgment as follows:

718136v1/6727-001

1.      After notice and hearing, preliminarily enjoining and restraining Casey and Casey

Summit and all persons in active concert with them from conveying, encumbering, transferring,

selling or otherwise disposing of any of their assets until further order of the Court;

2.      After notice and a hearing, preliminarily enjoining and restraining the Reach and

Apply Defendants and all persons in active concert with them from conveying, encumbering,

transferring, selling or otherwise disposing of any of their assets until further order of the Court

3.      On Count I, for the Trustee, avoiding the payment of the Casey Compensation as

a fraudulent transfer pursuant to 11 U.S.C. §548(a)(1)(A), such that the Trustee may recover the

Casey Compensation and preserve the avoided transfer for the benefit of the Estate pursuant to

11 U.S.C. §§550 and 551, and directing Casey and/or Casey Summit to pay the sum of not less

than $1,811,572.74 to the Trustee, plus interest dating from the date of this Complaint;

4.      On Count II, for the Trustee, avoiding the payment of the Casey Compensation as

a fraudulent transfer pursuant to 11 U.S.C. §548(a)(1)(B), such that the Trustee may recover the

Casey Compensation and preserve the avoided transfer for the benefit of the Estate pursuant to

11 U.S.C. §§550 and 551, and directing Casey and/or Casey Summit to pay the sum of not less

than $1,811,572.74 to the Trustee, plus interest dating from the date of this Complaint;

5.      On Count III, for the Trustee, determining that Casey breached his duties of care,

loyalty and good faith under applicable Massachusetts law and awarding damages in an amount

to be determined by the Court;

6.      On Count IV, for the Trustee, to the extent that the compensation paid to Casey

and the other members or their affiliates are found to be excessive, finding that such payments

constitute distributions to members while BGP was insolvent and holding Casey is liable to BGP

for such illegal distributions;

718136v1/6727-001

7.     On Count V, for the Trustee, piercing BGP's corporate veil and holding Casey liable for the debts of BGP;

8.     On Count VI, for the Trustee, avoiding the payment of the Laser Leasing Payments as fraudulent transfers pursuant to 11 U.S.C. §548(a)(1)(A), such that the Trustee may recover the Laser Leasing Payments and preserve the avoided transfer for the benefit of the Estate pursuant to 11 U.S.C. §§550 and 551, and directing Casey to pay the sum of not less than $21,401.43 to the Trustee, plus interest dating from the date of this Complaint;

9.     On Count VII, for the Trustee, avoiding the payment of the Laser Leasing Payments as fraudulent transfers pursuant to 11 U.S.C. §548(a)(1)(B), such that the Trustee may recover the Laser Leasing Payments and preserve the avoided transfer for the benefit of the Estate pursuant to 11 U.S.C. §§550 and 551, and directing Casey to pay the sum of not less than $21,401.43 to the Trustee, plus interest dating from the date of this Complaint;

10.    On Count VIII, for the Trustee, avoiding the payment of the Aesthetic Medical Payments as fraudulent transfers pursuant to 11 U.S.C. §548(a)(1)(A), such that the Trustee may recover the Laser Leasing Payments and preserve the avoided transfer for the benefit of the Estate pursuant to 11 U.S.C. §§550 and 551, and directing Casey to pay the sum of not less than $25,000 to the Trustee, plus interest dating from the date of this Complaint;

11.    On Count IX, for the Trustee, avoiding the payment of the Aesthetic Laser Payments as fraudulent transfers pursuant to 11 U.S.C. §548(a)(1)(B), such that the Trustee may recover the Aesthetic Medical Payments and preserve the avoided transfer for the benefit of the Estate pursuant to 11 U.S.C. §§550 and 551, and directing Casey to pay the sum of not less than $25,000 to the Trustee, plus interest dating from the date of this Complaint;

12.     On Count X, for the Trustee, avoiding the payment of the Home Mortgage Payments as fraudulent transfers pursuant to 11 U.S.C. §548(a)(1)(A), such that the Trustee may recover the Home Mortgage Payments and preserve the avoided transfer for the benefit of the Estate pursuant to 11 U.S.C. §§550 and 551, and directing Mrs. Casey to pay the sum of not less than $92,222.83 to the Trustee, plus interest dating from the date of this Complaint;

13.     On Count XI, for the Trustee, avoiding the payment of the Home Mortgage Payments as fraudulent transfers pursuant to 11 U.S.C. §548(a)(1)(V), such that the Trustee may recover the Home Mortgage Payments and preserve the avoided transfer for the benefit of the Estate pursuant to 11 U.S.C. §§550 and 551, and directing Mrs. Casey to pay the sum of not less than $92,222.83 to the Trustee, plus interest dating from the date of this Complaint;

14.     On Count XII, for the Trustee, enter judgment directing that Casey convey his interest in the Reach and Apply Defendants to the Trustee and authorizing the Trustee to sell those interests at public or private sale and apply the proceeds to the Trustee's judgment, and further, appointing a special master for the purpose of executing all documents necessary to transfer Casey's interest in the Reach and Apply Defendants, sell such interests and turn over the proceeds to the Trustee;

15.     On Count XIII, for the Trustee, granting injunctive relief restraining and enjoining the Reach and Apply Defendants, their respective members, agents, servants, and employees from in any way interfering with or impeding the Trustee's rights to reach and apply Casey's membership units in Casey Summit and Aesthetic Medical, his shares in Laser Leasing and his interest in the Trusts;

718136v1/6727-001

16.    On Count XIV, for the Trustee, granting injunctive relief against Casey and Casey Summit and all persons in active concert with them from conveying, encumbering, transferring, selling or otherwise disposing of any of their assets until further order of the Court;

17.    Continue the Preliminary Injunction against Casey and Casey Summit as a permanent injunction until the Trustee's judgment is satisfied;

18.    Continue the Preliminary Injunction against the Reach and Apply Defendants as a permanent injunction until the Trustee's judgment is satisfied;

19.    For such other relief as this Court deems just and proper.

GARY W. CRUICKSHANK,
CHAPTER 7 TRUSTEE OF
BOSTON GRAND PRIX, LLC,

By his attorneys,

*/s/ Kathleen R. Cruickshank*
Charles R. Bennett (BBO #037380)
Kathleen R. Cruickshank (BBO # 550675)
Murphy & King, P.C.
One Beacon Street
Boston, MA 02108
Tel.:  (617) 423-0400
Fax:  (617) 423-0498
E-mail:  KCruickshank@murphyking.com

Dated:  December 29, 2016

## <u>VERIFICATION</u>

The undersigned hereby affirms and swears that the factual allegations set forth in the above Verified Complaint are true and correct to the best of my knowledge, information and belief as of the date set forth below.


Dated: December ___, 2016                         _____
                                                  Gary W. Cruickshank, Chapter 7 Trustee of
                                                  Boston Grand Prix, LLC

718136v1/6727-001