# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| In re<br><br>**BOSTON GRAND PRIX, LLC,**<br><br>               **Debtor**<br>――――――――――――――――<br>**GARY W. CRUICKSHANK, Chapter 7 Trustee of Boston Grand Prix, LLC,**<br><br>               **Plaintiff**<br><br>**v.**<br><br>**JOHN CASEY et al.,**<br><br>               **Defendants** | **Chapter 7**<br>**Case No. 16-12574-FJB**<br><br><br><br><br><br><br><br>**Adversary Proceeding**<br>**No. 16-1200** |

## MEMORANDUM OF DECISION

Before the Court is the adversary complaint of Gary W. Cruickshank, as the chapter 7 trustee ("Plaintiff" or "Trustee") of Boston Grand Prix, LLC ("BGP" or the "Debtor"), against defendant John Casey ("Casey") and others to recover damages incurred as a result of Casey's diversion of assets of BGP to himself and persons and entities owned or controlled by him. The Court has previously disposed of the complaint as against all defendants except Casey. What remains are the following counts against Casey: Count I, under 11 U.S.C. § 548(a)(1)(A), for avoidance of actually fraudulent transfers to Casey or for his benefit; Count II, under 11 U.S.C. § 548(a)(1)(B), for avoidance of the same transfers as constructively fraudulent; Count III, under Massachusetts law, for breach of fiduciary duties of care, loyalty, and good faith; and Count V, also under Massachusetts law, to pierce the corporate veil (collectively, the "Remaining Counts").

Casey, who has throughout this adversary proceeding appeared *pro se* (when he has appeared at all), filed an answer in which he denied the operative allegations. The Court then issued a pretrial order

under Fed. R. Civ. P. 16, made applicable hereto by Fed. R. Bankr. P. 7016 (the "Pretrial Order"). The Pretrial

Order required that the parties file either jointly or separately a pretrial memorandum in which each party

was obligated to (i) indicate whether the party consents to the entry of a final order by the bankruptcy

court, (ii) identify and disclose (among other things) the witnesses he intended to call and the exhibits he

intended to introduce, and (iii) state his objections to the admissibility of the exhibits of the opposite party.

Despite many opportunities and notices, Casey failed to cooperate in the submission of a joint pretrial

statement and failed to file a separate one of his own. The Trustee then moved *in limine* for an order under

Fed. R. Civ. P. 16(f)(1)(C) precluding Casey at trial from (i) denying that he consented to the Court's entry

of a final order, (ii) calling witnesses and introducing exhibits he had not disclosed, and (iii) objecting to

the admission of the Trustee's exhibits. Rule 16(f)(1)(C) provides, in relevant part, that the court, "[o]n

motion or on its own, may issue any just orders including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a

party or its attorney . . . (C) fails to obey a scheduling order or other pretrial order." Fed. R. Civ. P.

16(f)(1)(C). Casey filed no response, whereupon the Court, in order to prevent unfair advantage at trial,

granted the motion with the following order:

> (1) John Casey is hereby precluded from taking the position that he does not
> consent to this Court's entry of final judgment as to any part of the adversary
> proceeding that does not constitute a core proceeding, and, for having failed
> to indicate otherwise, he is deemed to have so consented;
>
> (2) John Casey is hereby precluded from introducing evidence at trial,
> including both witnesses and exhibits; and
>
> (3) John Casey is hereby precluded from objecting to the Trustee's
> introduction of evidence at trial as set forth by the Trustee in his pretrial
> memorandum, including his fact witnesses, the qualifications and testimony
> of his expert witnesses, and the Trustee's proposed exhibits.

The Court then conducted a trial on the Remaining Counts. The Trustee presented testimony from

three witnesses and admitted twenty-six exhibits. Despite due notice, Casey failed to appear at the trial,

either *pro se* or through counsel. The Trustee then submitted proposed findings and conclusions, and the

Court heard closing arguments. Casey neither submitted proposed findings and conclusions nor appeared

at the closing arguments. As required by Fed. R. Civ. P. 52(a)(1), made applicable by Fed. R. Bankr. P. 7052, the Court now enters the following findings of fact and conclusions of law.

**JURISDICTION AND AUTHORITY**

This is a proceeding to recover fraudulent transfers (Count I and II) and to liquidate prepetition rights of action against Casey (Counts III and V). All four counts fall within the jurisdiction given the district court in 28 U.S.C. § 1334(b) because they arise in a bankruptcy case, and Count I and II also for the further reason that they arise under the Bankruptcy Code. By standing order of reference, the district court for this district has referred the matter to the bankruptcy court pursuant to 28 U.S.C. § 157(a). Counts I and II are core proceedings within the meaning of 28 U.S.C. § 157(b)(1) and (b)(2)(H) (a proceeding to determine, avoid, or recover a fraudulent conveyances is a core proceeding); Counts III and V are not core proceedings. As to those counts that are core proceedings, the bankruptcy court has authority to enter final judgment under 28 U.S.C. § 157(b)(1). The Trustee has expressly assented to this Court's entry of final judgment as to any count that is not a core proceeding; and, by virtue of the Court's order on the Trustee's motion *in limine* and Casey's failure to comply with the Pretrial Order, Casey is deemed also to have so consented. The bankruptcy court accordingly has authority under 28 U.S.C. § 157(c)(2) to enter final judgment on the non-core counts.

**FINDINGS OF FACT**[1]

**History of the Debtor**

1.      On July 5, 2016 (the "Petition Date"), BGP filed a voluntary Chapter 7 petition commencing this case,  and the Trustee was appointed.

2.      According to its schedules, as of the Petition Date, the Debtor had incurred at least $11,139,908.48 in debt.

---

[1] Allegations made in the Complaint that were neither admitted nor denied by Casey are deemed admitted pursuant to Rule 8(b)(1)(6) of the Federal Rules of Civil Procedure, made applicable by Fed. R. Bankr. P. 7008.

3.        BGP was organized under the laws of the Commonwealth of Massachusetts on or  about April 26, 2012. Mark Perrone ("Perrone") was the founder of BGP and its Chief Executive Officer until he resigned on or about December 28, 2015.  Perrone became a consultant to BGP through his consulting company, Sportserve, Inc.

4.        In or about May 2015, BGP entered into an agreement captioned *IndyCar Series 2016- 2020 Event Agreement* with IndyCar, LLC ("IndyCar") under which BGP was permitted to organize and present an IndyCar Series event in the City of Boston for a period of five years. In 2016, BGP entered into a License Agreement with the City that provided, among other things, for BGP to operate an automobile race in the Boston for a minimum  of five years.  According to the Debtor's Executive Summary (the "Executive Summary"), prepared by Casey for presentation to potential investors, BGP intended to construct a racetrack on the South Boston waterfront area consisting of a 2.2 mile length that encircled the Boston Convention Center, with the race to be run on each Labor Day weekend. BGP sought to raise four million dollars through a private offering with the proceeds to fund the upfront costs associated with building a track and its ancillary expenses. The revenue generated from the event would come from sponsorships, hospitality sales, ticket sales, and other related income-producing events.

5.        Revenue estimates in the Debtor's business plan were that BGP would raise nearly $15 million from ticket sales, sponsorships, and hospitality sales.  Commencing in March of 2016, the Debtor sold approximately $1.6 million in  tickets for the events to take place on Labor Day weekend of 2016.

6.        For reasons not relevant to this adversary proceeding, the Debtor cancelled the IndyCar event scheduled for Labor Day weekend in September 2016.  When BGP failed to return the proceeds of ticket sales and other amounts, the Massachusetts Attorney General sued BGP and Casey for the return of those proceeds. Casey caused BGP to refund approximately $400,000 in ticket sales, and nearly $1 million dollars was raised by the Attorney General from IndyCar, LLC and used to refund ticketholders.

**John Casey and His Role at BGP**

7.        Casey holds an undergraduate degree in accounting and an MBA from Babson College.

8.        He holds a Certified Public Accountant license and worked at an accounting firm until he began a career in banking and finance. He next become a senior financial manager for a medical device company. Casey moved on to start his own medical device company, which he eventually sold, and took an early retirement until he became involved with BGP.

9.        Casey was the Chief Financial Officer of BGP from January 1, 2015 until June of 2016. He was one of two managing members of BGP and became the sole managing member after Perrone resigned on February 1, 2016.

10.        From December 28, 2015 through June of 2016, Casey Summit, LLC ("Casey Summit"), an entity in which Casey is the sole manager and member, was designated as the Chief Executive Officer of BGP; however, Casey testified at deposition[2] that he considered himself and Casey Summit to be one and the same.  Based on his testimony, after September 1, 2015, Casey was effectively both the CEO and the CFO of BGP until June of 2016.

11.        Casey never produced a signed limited liability company operating agreement for BGP, despite due request. Moreover, Casey could not recall whether he had ever signed such an operating agreement for BGP.

**BGP's Bank Accounts**

12.        BGP maintained three bank accounts: (i) a Citizens Bank account under the name of "Boston Grand Prix, LLC," with an account number ending 3239 (the "Citizens Account"); (ii) a Leader Bank account entitled "Boston Grand Prix, LLC/John Casey/Tickets," with an account number ending 8117; and (iii) a Leader Bank account entitled "Boston Grand Prix, LLC/John Casey/Merchandise," with an account number ending 8109.

---

[2] All references to Casey's testimony are to his testimony at deposition. He did not testify at trial.

13.     Casey was the sole signatory on the two Leader Bank accounts and one of two signatories, along with Perrone, on the Citizens Account. No debit or ATM cards were issued for the two Leader Bank accounts. While Casey and Perrone were signatories on the Citizens Account, only Casey signed checks from that account. Both Casey and Perrone were in possession of a debit card for the Citizens Account.

**Books and Records of BGP**

14.     Casey testified that he maintained the books and records for BGP.

15.     Based on expert testimony detailed later, I find that BGP failed to maintain, but should have maintained, a double entry (i.e., debits and credits) set of books and records consisting, at a minimum, of (i) a cash receipts journal, (ii) a cash disbursements journal, (iii) a general ledger, and (iv) monthly bank reconciliation worksheets. These records can be created relatively easily by a business owner, clerk, or bookkeeping service with the use of inexpensive bookkeeping software.

16.     A company maintaining these records would be able to produce such basic accounting records as: (i) a trial balance worksheet, which consists of a list of each general ledger account and its balance on a given date, organized by debit and credit columns, totaled and shown to be equal, thereby proving the books are in balance; (ii) a balance sheet; (iii) an income statement; and (iv) payroll records.

17.     Although Casey is a licensed CPA with extensive experience and anticipated that millions of dollars would flow through the bank accounts, he operated BGP without maintaining appropriate books and records. He never hired a bookkeeper for the Debtor or purchased bookkeeping software to track its income and expenses. Invoices to BGP were sent to and maintained only on Casey's personal email account.  Casey did not maintain books and records for accounts payable other than what was in his email account.  He testified that he kept track of those accounts "in his head." Casey did not keep a checkbook register for BGP. He used his personal laptop to conduct the business of BGP.

18.     The sole record that Casey produced to the Trustee with respect to BGP's income and

expenses was a single spreadsheet entitled "Boston Grand Prix Trial Balance," which he referred to as a "trial balance" (the "<u>Casey Accounting</u>"). Casey testified that he thought that the Casey Accounting was sufficient to serve as the books and records of BGP. The Casey Accounting was not created until May 14, 2016, after the race was cancelled. As such, the Casey Accounting is an after-the-fact attempt to recreate a summary of BGP's receipts and disbursements. The Casey Accounting is inadequate to serve as a competent business record of BGP.

19.       The Casey Accounting is unreliable and is not a proper trial balance or a cash receipts and disbursements journal. The Casey Accounting: (i) contains entries with no dates, check numbers, or other identifying information; (ii) does not differentiate among BGP's three bank accounts; (iii) does not include all receipts and disbursements contained in the BGP bank statements; (iv) fails to account for ATM and debit card transactions in the Citizens Account; and (v) at the time the bankruptcy was filed, was not in balance.  Casey did not always record individual disbursements on the Casey Accounting; rather, he would add up various payments shown on a bank statement for a particular category, including for his compensation, and record only the total balance of the amounts in a category.

20.       The Casey Accounting could not have been used contemporaneously to reconcile BGP's bank statements because it: (i) does not differentiate among the three BGP bank accounts, (ii) does not list individual checks or check numbers; (iii) does not contain dates; (iv) does not contain cash balances; (v) makes no reference to bank statement cash balances; and (v) does not contain notations indicating which checks and disbursements cleared the bank account. In addition, the total of the disbursements in the Casey Accounting equals $5,672,915.09, which is $328,360.26 less than the total of the disbursements in BGP's bank statements. The total of receipts in the Casey Accounting is $5,734,311.47, which is $277,076.04 less than the $6,011,387.51 total of receipts in BGP's bank statements. Based upon the total receipts and disbursements entered in the Casey Accounting, there should have been a surplus of cash in the BGP accounts at the Petition Date of $61,396.38, but there was not.

21.     The Trustee called William Gabovitch, the accountant the Trustee had retained in this case, as an expert witness. Gabovitch testified that in his forty-year career, this case was the first time that he had seen a business of this size that kept no financial accounting books and records from the inception. By failing to keep contemporaneous records, failing to employ a bookkeeper or use QuickBooks software, and waiting until the race had been cancelled to reconstruct books from memory, Casey acted as if he were a sole proprietor, not the CEO of an LLC.

22.     In light of Casey's stated qualifications as a CPA and his training and extensive experience in accounting and finance, Casey had the ability to cause BGP to maintain adequate records to prepare financial statements and federal and state income and payroll tax returns, and to allow an independent third party, such as an investor, an outside accountant, a creditor, or a tax auditor to track BGP's income and expenses. I further find that he understood the importance to BGP and its creditors of maintaining adequate records, yet he failed to implement an adequate record-keeping system. No such records were produced to the Trustee or at trial, and no explanation for the lack of records was provided.

**BGP Tax Compliance**

23.     In addition to failing to maintain adequate books and records for BGP, Casey failed to ensure BGP's compliance with applicable income, payroll, and tax laws, thereby exposing BGP to potential tax liabilities, penalties, and interest. Casey did not hire an outside accountant for BGP and did not cause BGP to file income tax returns or quarterly payroll tax returns prior to the Petition Date. Casey testified that he withheld income, Social Security, and Medicare taxes from employee wages, but maintained no records detailing the types of taxes and corresponding amounts withheld; nor did he remit any of the withheld taxes to any taxing authority. As a result, BGP's employees were required to reconstruct their gross wages and withholdings. Casey acknowledged that he never used a payroll service or caused BGP to file with federal or state taxing authorities any monthly, quarterly, or annual payroll tax returns, or federal tax forms 1099, W-3, or W-2. Casey acknowledged that in addition to not remitting to the taxing

authorities the employee's share of withheld taxes, he did not cause BGP to pay any of the employer's

share of federal or state unemployment taxes and did not register BGP with the Massachusetts Division of

Unemployment Assistance. No evidence of payments for any workers compensation insurance for BGP's

employees was offered or admitted at trial. In light of Casey's stated qualifications as a CPA and his training

and extensive experience in accounting and finance, I infer that Casey should have caused BGP to maintain

adequate records to prepare financial statements, federal and state income and payroll tax returns, and to

allow an independent third party, such as an investor, an outside accountant, a creditor, or tax auditor to

track BGP's income and expenses. No such records were offered in evidence, and no explanation for the

lack of records was provided.

### Amounts paid by BGP to or on Behalf of Casey and Entities He Controlled

24.       The Trustee retained an accountant to create a summary of the Debtor's disbursements

to be prepared from BGP's three bank accounts, except for cash and debit withdrawals, for the period

from February 5, 2015 through May 31, 2016 (the "Disbursements Detail").

25.       Of the approximately $6 million in disbursements, Casey caused BGP to pay not less than

$1,911,575.74 (the "Casey Payments") to Casey, to entities that he controlled, and to third parties for his

personal benefit. The Casey Payments are comprised of the following: (i) "compensation" to Casey (the

"Casey Compensation"), consisting of $948,922.59 in payments that Casey caused BGP to make to himself,

to entities he controlled, and to third parties on his behalf, and which payments Casey testified were part

of his compensation, and $100,000 paid to Raymond James & Associates (the "Raymond James Payment")

to open an investment account in Casey's name; and (ii) $862,580.15 in further BGP disbursements (the

"Undocumented Disbursements") for which Casey provided no supporting information documenting any

business purpose.

#### a.   The Casey Compensation

26.       Casey caused BGP to pay him for his duties as Chief Financial Officer at the rate of $4,000

per month, to pay him a car allowance, and to pay his health insurance.  Casey did not  enter into an

employment agreement with BGP for his position as CFO. BGP also paid $2,728.84 per month for the

health insurance of Casey and his family.

27.    Casey had no experience in running Grand Prix races. He testified that he became the

Chief Executive Officer (through Casey Summit) because no one else wanted the role. Despite this, BGP

and Casey Summit were parties to an employment contract for Casey Summit to serve as the Chief

Executive Officer of BGP. The contract provided for Casey Summit to receive, among other things, $35,000

per month. No one negotiated Casey Summit's CEO contract. Casey testified that he effectively took over

Mark Perrone's CEO contract and that Perrone agreed to its terms.

28.    In addition to amounts paid to Casey and Casey Summit, Casey testified that BGP often

paid expenses on his behalf and that it was "immaterial" that he paid his personal expenses directly from

BGP funds as long as he recorded those payments as income to himself. Casey testified that when BGP paid

personal expenses on Casey's behalf, he "counted" these amounts as his compensation.

29.    Based on this review of the available documents, the Trustee's accountant summarized

the amounts that Casey paid to himself, purportedly as compensation, as follows: (i) $85,500 paid to Casey

directly and $21,819.90 for his health care; (ii) $488,614.84 paid to Casey Summit; (iii) $21,401.43 paid to

Laser Leasing, Inc., an entity controlled by Casey, which payments had no business purpose; and (iv)

$306,647.62 paid to third parties on Casey's behalf (other than for health insurance, Casey Summit, and

Laser Leasing) that Casey conceded in testimony had no business purpose (the "Third-Party Payments").

("Casey Compensation Summary")

30.    The Third-Party Payments itemized in the Casey Compensation Summary include the

following:

(i)    $124,391.90 in charges made on Casey's personal American Express, Chase, and Bank
of America credit cards which were paid by BGP and which Casey acknowledged were
personal in nature, including $59,337.86 in payments to Bank of America, which
credit card he conceded in his testimony was used solely for personal expenses.

(ii)    $92,222.83 paid to People's United Bank on account of the mortgage on Casey's home, including $49,657.80 paid directly from a BGP account and $43,565.03 paid in two checks from the Casey Summit Account, defined below, immediately following the deposit of the Transferred Funds, defined below, from BGP.

(iii)    $25,000 to Aesthetic Medical Lasers, LLC, $27,300 to Dedicated Commercial Recovery, $10,000 to Reading Co-operative Bank, and $9,288.68 to Sterling National Bank, all on account of debts owed by Casey or an entity he controlled and which had no purpose related to BGP's business.

(iv)    $20,000 to Coast to Coast Automobile, paid as a down payment for a 2014 BMW M6 automobile that Casey registered in his own name. He testified that he registered it in his own name to circumvent a state law forbidding persons under 23 from driving a car registered to a corporation so that teenagers could drive it. He also paid at least $2,603.04 to Ally Bank for loan payments made for the BMW. At least one of Casey's sons was in high school.

(v)    $6,618.64 to Tom James Co. to pay for Casey's suits.

(vi)    $10,200 in rent payments paid to a landlord for an apartment BGP rented but never used, and $4,250 as a broker's fee to Charlesgate Realty for locating the apartment.

(vii)    $22,172.62 to Herb Chambers Porsche as a down payment on the Porsche Cayenne that is registered to Casey and at least $4,988.89 paid to Porsche Financial Services, the company that financed the purchase of the Porsche.

31.    Casey acknowledged in his testimony that BGP paid $608,166 in the aggregate to him, entities controlled by him, and third parties on his behalf. In fact, however, as set forth above, based on Casey's own testimony, Casey caused BGP to pay him and other parties for his personal benefit not less than $948,992.59.

32.    At trial, Gabovitch, the Trustee's accountant, added the Raymond James Payment to the amounts paid on Casey's behalf. Casey testified that the Raymond James Payment had no business purpose and was paid on behalf of Mark Perrone in August of 2015 and that he recorded it on the Casey Accounting as compensation to Perrone. As a result, Gabovitch originally included the Raymond James Payment as compensation to Perrone.

33.    Gabovitch testified that following the preparation of his expert report, he had an opportunity to review records subpoenaed from Raymond James & Associates, which demonstrated that

the account opened with the Raymond James Payment was in fact in the name of John Casey and not

Perrone. As a result, the Trustee contends and I find that the $100,000 should be added to Casey's

compensation, bringing his total compensation (including the Undocumented Disbursements, discussed

below) to $1,911,575.74.

34.    Despite Casey's testimony that the amounts detailed above were his compensation, he

did not cause BGP to issue him or Casey Summit a tax Form W-2 or Form 1099 (such that his compensation

would be reported to the taxing authorities), and he did not provide testimony to justify the

reasonableness of his compensation. Moreover, Casey Summit did not issue invoices to BGP.

35.    I find that of the payments summarized in the Casey Compensation Summary, all of which

Casey contends were compensation for his service to BGP in whatever capacity, only the $85,500 paid to

Casey directly and the $21,819.90 paid for his health care, for a total of $107,319.90, were actual

compensation for services rendered. He did not account for the remainder as compensation, either on

books of BGP or in mandatory reporting to the IRS, and Casey's attempt to recharacterize them as such is

not credible. They would in any event be grossly disproportionate to the value of his service to BGP,

especially in the period where his principal efforts appear to have consisted of nothing but channeling

monies of the insolvent Debtor to himself or to others for his benefit, in knowing contravention of the

rights of the BGP's creditors.

36.    Except for the $107,319.90 that constituted actual compensation for services rendered,

the transfers comprising the Casey Payments was made solely for Casey's personal benefit, not for the

benefit of the Debtor, provided no benefit to the Debtor, and, as I find later, were made at a time when

the Debtor was insolvent.

37.    Under the circumstances, I infer that Casey (i) knew and was intending to conceal that

the payments made to him and to third parties for his benefit were unrelated to the Debtor's business and

provided no benefit to the Debtor, (ii) knew and was intending to conceal that any services he provided on

behalf of BGP were not reasonably equivalent in value to amounts paid to Casey and to third parties for his

benefit, and (iii) failed to maintain records for BGP intentionally in order to conceal his misconduct.

### b.  The Undocumented Disbursements

38.      The Undocumented Disbursements, for which Casey has not provided to the Trustee or

at trial supporting information, include: (i) at least $117,306.59 in cash withdrawals from the Citizens

Account, (ii) $15,096.46 in disbursements to unknown or unidentified payees, (iii) $67,154.63 in illegible

checks written from BGP accounts for which Casey has provided no identifying information, (iv)

$211,366.45 in ATM withdrawals and debit card charges from the Citizens Account, and (v) $255,291.82 in

charges on Casey's personal American Express and Chase credit cards which were purportedly for business

expenses but for which Casey provided to the Trustee no supporting information. Based upon Casey's

failure to provide documentation to demonstrate the business purpose of the Undocumented

Disbursements, Gabovitch testified that, in his expert opinion, and I find, they were personal in nature and

therefore should be considered part of Casey's compensation.

39.      The Trustee introduced evidence supporting his contention that the Undocumented

Disbursements should be found to be disbursements to Casey or for his benefit. Casey testified that he

regularly withdrew cash from BGP.  He testified that he made cash withdrawals of $500 per week to pay

for parking for him, his employees, and guests; however, when questioned about a $5,000 cash withdrawal

on April 25, 2016, four days prior to the cancellation of the race, Casey could not identify the purpose of

the withdrawal. Casey was asked to provide documentation demonstrating the business purpose of cash

withdrawals and testified that he would research them and provide a reconciliation. No such reconciliation

was ever produced to the Trustee, and none was offered at trial. At least $117,305.75 in cash withdrawals

are included in the Undocumented Disbursements. Also included in the Undocumented Disbursements are

literally hundreds of unaccounted for ATM and debit charges from the Citizens Account, totaling in excess

of $210,000 for, among other things, restaurants, hotels, airfare, and concert tickets. Casey testified that

13

he did not keep records to track the detail or business purpose of the BGP debit card charges. As noted

above, included in the Undocumented Disbursements are $120,622.43 of BGP's payments to American

Express and $134,669.39 of BGP's payments to Chase for charges on Casey's personal credit cards and

which Casey maintained were business related, but for which no evidence substantiating their business

purpose was produced to the Trustee or offered at trial.

40.      BGP paid American Express $155,854.27 and Chase $142,896.64 for charges on Casey's

personal credit cards, a total of $298,750.91. BGP did not have a corporate credit card, and from

September 2015 through May 2016, BGP paid all charges on Casey's personal credit cards, regardless of

whether the charges were personal or business related. Casey produced to the Trustee no evidence that

the expenses were for BGP business purposes and no such evidence was admitted at trial.

41.      Casey retained no documents to support the business purpose of any of the

Undocumented Disbursements, making it impossible to substantiate whether these charges were for

proper BGP business expenses.  Nor was it possible to prepare accurate books and records or tax returns

for the Debtor.

42.      I therefore conclude that, without information and records substantiating the business

purpose of the Undocumented Disbursements, these payments were not business expenses but were for

Casey's personal expenses. If the total of the Undocumented Disbursements is added to Casey's

$948,992.50 in compensation shown on the Casey Compensation Summary, Casey's personal

compensation is increased to at least $1,811,575.74. When the Raymond James Payment is added, the

total of BGP's payments to or on behalf of Casey totaled not less than $1,911,575.74, or approximately

32% of all BGP's disbursements.

43.      In light of Casey's stated qualifications as a CPA and his training and extensive

experience in accounting and finance, Casey had the ability to cause BGP to maintain adequate records to

prepare financial statements and federal and state income and payroll tax returns, and to allow an

independent third party, such as an investor, an outside accountant, a creditor, or a tax auditor to track BGP's income and expenses. I further find that he understood the importance to BGP and its creditors of maintaining adequate records, yet he failed to implement an adequate record-keeping system. No such records were produced to the Trustee or at trial, and no explanation for the lack of records was provided.

44.    Each of the transfers comprising the Undocumented Disbursements was made solely for Casey's personal benefit, provided no benefit to the Debtor, and, as I find below, was made at a time when the Debtor was insolvent.

45.    Under the circumstances, I infer that Casey (i) knew and intended to conceal that the Undocumented Disbursements were unrelated to the Debtor's business and provided no benefit to the Debtor, (ii) knew and intended to conceal that any services he provided on behalf of BGP were not reasonably equivalent in value to amounts paid to Casey and to third parties for his benefit, and (iii) failed to maintain records for BGP intentionally in order to conceal his misconduct.

**The Transferred Funds**

46.    As noted, the IndyCar race was cancelled on April 29, 2019.

47.    Between May 2, 2016 and May 6, 2016, at a time that (as I find below) BGP was insolvent, Casey caused not less than $630,000 of the Debtor's funds to be transferred (the "Transferred Funds") to an account maintained by Casey Summit at Citizens Bank (the "Casey Summit Account"), thereby removing these funds from the reach of Debtor's creditors. No written agreement between BGP and Casey Summit was offered at trial with respect to the Transferred Funds. At a time when creditors were owed millions of dollars (as described below), Casey disbursed approximately half of the Transferred Funds for his personal benefit.  Casey produced an accounting of the Transferred Funds to the Trustee (the "Transferred Funds Summary"). The Transferred Funds Summary was admitted in evidence.  That summary was an informal list of amounts, mostly in round numbers, some of which contain shorthand references to purported payees, others of which reference only a purpose, such as "Attorney Fees," purportedly for the

benefit of BGP.  The Transferred Funds Summary does not include Casey Summit Account check numbers, wire transfer references, or other identifying information. There is no audit trail from which to trace the amounts to their original source documents. No receipts or invoices from the payees were produced to the Trustee or admitted at trial. There is no indication of the business purpose of each payment.  Only three of the line items contained in the Transferred Funds Summary match payments actually made from the Casey Summit Account. Casey failed to provide to the Trustee any documentation or substantiation for $313,404.97 of the Transferred Funds.

48.     Disbursements from the Casey Summit Account, following the deposits of the Transferred Funds include:

(i)     $43,565.03 paid in two checks, on May 6, 2016 and May 10,  2016, to People's United Bank, which Casey testified holds mortgages on his home;

(ii)    $150,000 paid on May 18, 2016 to Casey Summit and apparently deposited to another account  controlled by Casey Summit;

(iii)   $21,595.03 to Chase, on one of Casey's personal credit cards;

(iv)    $4,000 paid to Jones, Waldo, a law firm, which Casey testified was a personal debt;

(v)     $55,000 paid in May and June of 2016 to K&L Gates, after K&L Gates no longer represented BGP;

(vi)    $2,000 in cash withdrawals;

(vii)   $3,669.06 wired to Sterling National Bank, which, Casey testified was a personal debt; and

(viii)  $3,900 wired to Dedicated Commercial Recovery, which, Casey testified was a personal debt.

49.      In light of Casey's stated qualifications as a CPA and his training and extensive experience in accounting and financing, it is reasonable to expect that Casey would have caused BGP to maintain records adequate to prepare financial statements and federal and state income and payroll tax returns and to allow an independent third party, such as an investor, an outside accountant, a creditor, or

a tax auditor, to track BGP's income and expenses. No such records were produced and admitted at trial, and no explanation for the lack of records was provided by Casey.

50.      Each of the transfers made to Casey or to third parties for Casey's benefit from the Transferred Funds was made solely for Casey's personal benefit and not for the benefit of the Debtor.  The payments from the Transferred Funds provided no benefit to the Debtor.

51.      Based on the foregoing, I infer that Casey (i) knew and intended to conceal that the payments made to him and to third parties for his benefit were unrelated to the Debtor's business and provided no benefit to the Debtor, (ii) knew and intended to conceal that any services he provided on behalf of BGP were not reasonably equivalent in value to the disbursements made for his personal benefit from the Transferred Funds, and (iii) deliberately failed to maintain records for BGP, with intent to hide his misconduct.

**BGP's Transactions with Casey-Controlled Entities**

52.      Casey caused BGP to make payments for the benefit of entities he controlled without any corresponding benefit to BGP, including the following:

(i)      Casey provided the Debtor with the use of several  vehicles owned by Laser Leasing.  No documents governing these transactions were produced to the Trustee or at the trial. Casey caused BGP to pay both the loan payments for the vehicles and the shortfall on the loans after the vehicles were sold.

(ii)      BGP used a pickup truck owned by Laser Leasing and on September 10, 2015 paid $31,000 to North Shore Bank to pay off the  loan against the pickup truck. No documentation was produced with respect to this transaction to either the Trustee or at the trial.

(iii)      Casey caused BGP to pay $20,000 on the purchase a 2014 BWM M6 and registered it in his own name. Casey also caused BGP to pay at least $2,603.04 in loan payments on that vehicle. Casey subsequently sold the BMW at a loss and paid the shortfall on the vehicle from BGP funds.

(iv)      Casey caused BGP to pay $18,200 for use of a hockey rink located in Peabody, Massachusetts and owned by Casey Summit. Casey testified that the rink was used by investors and sponsors and that Casey Summit issued an invoice to BGP. The one invoice Casey provided from Casey Summit is dated April 14, 2016, purports to cover a period of one  year and four months (January 2015 through

17

April 2016), and is therefore not a contemporaneous record.

**Insolvency of BGP**

53.     Evidence concerning the solvency of BGP was admitted at the trial; and based on the following, I find that BGP was insolvent from at least May 18, 2015 through the Petition Date.

54.     BGP did not receive the requisite governmental licenses and permits that would have allowed it to conduct and run IndyCar races beginning on Labor Day 2016. Accordingly, as of April 22, 2016, the assets of BGP had only liquidation value, not going concern value.

55.     As of April 25, 2016, BGP had received $2,539,550 in cash from sponsorships, and the remainder of the sponsorships were pledges or receivables. Based upon the testimony of the Trustee's expert witness Craig Jalbert ("Jalbert"), which testimony I find credible, the cash received and the future sponsorship pledges required conditions such that they could not be earned until the race was actually held.  Accordingly, the cash received in sponsorships as of that date required a liability or refund reserve. In addition, the receivables or pledges received by that date required a corresponding reserve or liability entry on the balance sheet to reflect their status as contingent assets in the insolvency analysis, such that they would have a significantly reduced value.

56.     BGP liabilities exceeded its assets by $5,801,071 as of April 22, 2016, and BGP remained insolvent at all times thereafter until the Petition Date. Based upon the expert report and testimony of Jalbert, another judge of this court determined after a full trial (in another, related adversary proceeding) that BGP was insolvent from the period commencing April 22, 2016 through the Petition Date.  See *Cruickshank v. George R. Roberts Company* (*In re Boston Grand Prix, LLC)*, 599 B.R. 448, 470 (Bankr. D. Mass. 2019) (the court found that Jalbert's conclusion that by April 22, 2016 BGP was insolvent by $5,801,071 was "well supported").  I too so find.

57.     I also find that the Debtor was insolvent prior to that period.  On May 18, 2015, the Debtor entered into a license agreement with IndyCar (the "IndyCar Agreement") that obligated BGP to

18

pay $5 million to IndyCar at a minimum regardless of whether the race was run. That obligation became a liability of BGP immediately upon execution of the contract.

58.    At no point did BGP have assets that exceeded that liability. The total equity investment in BGP was approximately $1.9 million dollars.

59.    It follows that BGP was insolvent from at least May 18, 2015 through the Petition Date.

**Casey's Relationship with BGP**

60.    At all relevant times, Casey maintained pervasive control over the Debtor. As managing member, officer, and person in control of the Debtor, he caused intermingling of the activities and operations of BGP and his personal affairs by causing BGP to pay entities he controlled without a business purpose and to pay third parties for his personal benefit with no corresponding benefit to BGP. Among other things, BGP did not maintain company credit cards but purportedly used Casey's personal credit cards for business purposes, and BGP paid all the charges, regardless of whether they were business or personal. No substantiating records were produced to the Trustee or offered or admitted at trial to support the business purpose of any of the charges; and large amounts of cash were withdrawn from BGP accounts with no record of their purpose.

61.    Casey, as managing member and person in control of BGP, reported to no one, failed to observe appropriate corporate formalities, and caused BGP to simply function as his alter ego.

62.    Casey, as managing member and person in control of BGP, engaged in self-dealing.

63.    At all relevant times herein, and at least from May 18, 2015 to the Petition Date, BGP was insolvent.

64.    At all relevant times, the Debtor had no real tangible assets other than the cash it raised from investors and sponsors.

65.    Casey, as the person in control of the Debtor, set his own compensation without input from any party.

66.    The Casey Payments, consisting of the Casey Compensation, the Undocumented Disbursements, and the Raymond James Payment, caused Casey to be paid not less than $1,911,575.74, which monies were paid either to himself, to entities he controlled, or to third parties for his personal benefit.  This amount represents approximately thirty two percent (32%) of the $6,001,275.35 total of funds disbursed by BGP.

67.    Casey, as the person in control of BGP, used the corporation to perpetrate a fraud upon its creditors. Casey's actions deprived the Debtor of necessary capital for its operations and caused the Debtor's financial condition to deteriorate significantly.

**CONCLUSIONS OF LAW**

**Count I: Fraudulent Transfers, 11 U.S.C. § 548(a)(1)(A)**

The Trustee alleges that the Casey Payments should be avoided under 11 U.S.C. § 548(a)(1)(A) as fraudulent transfers. The elements necessary to establish a fraudulent transfer for actual fraud under 11 U.S.C. § 548(a)(1)(A) are (1) a transfer (2) of an interest of the debtor in property (3) that occurred within two years prior to the filing of the petition, (4) where the debtor made the transfer with "actual intent to hinder, delay, or defraud" one of its creditors.  *Andrews v. RBL, L.L.C. (In re Vista Bella, Inc.)*, 511 B.R. 163, 214 (Bankr. S.D. Ala. 2014).

The Casey Payments were paid by BGP within two years of the Petition Date, at a time when BGP was insolvent, and they constituted transfers of interests in property of the Debtor. Actual intent "may be predicated upon the concurrence of facts which, while not direct evidence of actual intent, lead to the irresistible conclusion that the transferor's conduct was motivated by such intent." *In re F & C Services, Inc.*, 44 B.R. 863, 872 (Bankr. S.D. Fla.  1984) (citing 4 COLLIER ON BANKRUPTCY ¶ 548.02[5] at 548-33-34 (15th ed. 1984)).

I conclude that Casey caused BGP to pay to him, his wholly owned entity, Casey Summit, other entities controlled by Casey, and third parties for his benefit, payments totaling $1,911,575.74.  Except for

the $107,319.90 that constituted payment for his services, the Casey Payments served no business purpose of the Debtor. In view of Casey's qualifications as a CPA and his training and extensive experience in accounting and financing, and the lack of records to justify the business purposes of the Casey Payments, I find that Casey caused the payments to be made with knowledge that they served no business purpose and with actual intent to put the monies in question beyond the reach of the creditors to whom the Debtor was or became indebted. I further find that by making the Casey Payments and failing to keep adequate records of them, Casey intended to and did hinder and delay creditors to which the Debtor was or became indebted and the Trustee acting on their behalf.

As a result of the forgoing, I conclude that on Count I, the Trustee is entitled to a judgment avoiding the Casey Payments, less only the $107,319.90 that constituted payment for his services [the Casey Payments, less the $107,319.90, the "Net Casey Payments"], as fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A), such that the Trustee may avoid the Net Casey Payments and recover them from Casey. Moreover, Casey was the immediate transferee of the Net Casey Payments or the person for whose benefit the Net Casey Payments were made, such that the value of the Net Casey Payments may be preserved and recovered by the Trustee for the benefit of the Estate pursuant to 11 U.S.C. §§ 550(a) and 551. Judgment shall accordingly enter against Casey on Count I in the amount of $1,804,255.84 plus interest from the date of the Complaint.[3]

**Count II: Fraudulent Transfers, 11 U.S.C. § 548(a)(1)(B)**

The Trustee further seeks to avoid and recover the same transfers under 11 U.S.C. § 548(a)(1)(B). The elements necessary to establish a constructive fraudulent transfer under 11 U.S.C. § 548(a)(1)(B), are, in pertinent part, (1) a transfer (2) of an interest of the debtor in property (3) that occurred within two years prior to the filing of the petition, (4) for which the debtor received less than a reasonably equivalent

---

[3] With respect to the recovery of a preferential or fraudulent transfer, interest accrues from the date of demand, but if no demand was made then from the date on which the adversary proceeding was commenced. *Gray v. Travelers Ins. Co.* (*In re Neponset River Paper Co.*), 219 B.R. 918 (Bankr. D. Mass. 1998), *aff'd* 231 B.R. 829 (1st Cir. BAP 1999).

value in exchange for the transfer, and (5) the debtor was insolvent on the date of the transfer. *Andrews v.*

*RBL, L.L.C. (In re Vista Bella, Inc.)*, 511 B.R. at 214.

The Bankruptcy Code does not define "reasonably equivalent value." Courts have uniformly held

that a reasonably equivalent value determination should be based on all the facts and circumstances of the

case. *Tri-Star Techs. Co. v. Pitocchelli (In re Tri-Star Techs. Co.)*, 260 B.R. 319, 325 (Bankr. D. Mass. 2001).

While it is not necessary that there be an exact exchange, the Court "must keep the equitable purposes of

the statute firmly in mind, recognizing that any significant disparity between the value received and the

obligation assumed . . . will have significantly harmed . . . innocent creditors[.]" *Id.* at 326, citing *Rubin v.*

*Manufacturers Hanover Trust Co.,*661 F.2d 979, 994 (2nd Cir. 1981). See also *Nickless v. Pappas (Prime*

*Mortg. Fin., Inc.)*, 2011 Bankr. LEXIS 494, *11. The Third Circuit requires a "totality of the circumstances"

analysis, taking into account "the good faith of the parties, the difference between the amount paid and

the market value, and whether the transaction was at arm's length." *Peltz v. Hatten*, 279 B.R. 710, 736 (D.

Del. 2002) (*quoting Mellon Bank, N.A. v. Official Comm, of  Unsecured Creditors of R.M.L., Inc. (In re R.M.L.,*

*Inc.*), 92 F.3d 139, 148-49 (3d Cir. 1996). This analysis is inherently fact driven. *See Peltz*, 279 B.R. at 736.

BGP made the Casey Payments within two years of the Petition Date, at a time when BGP was

insolvent, and each Casey Payment was a transfer of an interest of the Debtor in property. The Casey

Payments were made solely at Casey's discretion in the absence of any arms' length negotiation, were

concealed, and, except only for the $107,319.90 paid for his services, were made for Casey's personal

benefit without limit and without corresponding benefit to the Debtor. I therefore find that the Debtor did

not receive reasonably equivalent value in exchange for the Net Casey Payments.

I therefore conclude on Count II that the Trustee is entitled to judgment avoiding the Net Casey

Payments as fraudulent transfers pursuant to  11 U.S.C. § 548(a)(1)(B), such that the Trustee may recover

the Net Casey Payments from Casey. I further conclude that, as to each of the Net Casey Payments, Casey

was either the immediate transferee of the payment or the person for whose benefit the payment was

made.  It follows that the value of the Casey Payments may be preserved and recovered by the Trustee for

the benefit of the Estate pursuant to 11 U.S.C. §§ 550(a) and 551. Judgment shall accordingly enter against

Casey on Count II in the amount of $1,804,255.84 plus interest from the date of the Complaint.[4]

**Count III: Breach of Fiduciary Duties of Care, Loyalty, and Good Faith**

In Massachusetts, the directors and officers of a corporation stand in a fiduciary relationship to the

corporation. *Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 528, 677 N.E.2d 159 (1997);

*Durfee v. Durfee & Canning, Inc.*, 323 Mass**.** 187,  196, 80 N.E.2d 522 (1948). Likewise, the manager of a

limited liability company owes a fiduciary duty to the company. *Martin v. Martin*, 2019 Mass. Super. LEXIS

482, *17.  Moreover, a fiduciary duty of loyalty to the corporation is "especially exacting where the

corporation is closely-held." *Cumberland Farms*, 284 F.3d at 227 (quoting *Cooke v. Lynn Sand & Stone, Co.*,

37 Mass**.**App.Ct. 490, 496, 640 N.E.2d 786 (1994)).  Fiduciary duties of members of a closely held LLC are

essentially the same as those of shareholders of a closely held corporation., *Butler v. Moore*, 2015 U.S.

Dist. LEXIS 39416, *177-178, citing *Donahue v. Rodd Electrotype Co.,* 367 Mass. 587, 585 (1975). Moreover,

fiduciaries owe to the corporation and its shareholders a duty of care and a  "paramount duty of loyalty."

*Demoulas*, 424 Mass. at 528; *Spiegel v. Beacon Participations,   Inc.*, 297 Mass. 398, 410-11, 8 N.E.2d 895

(1937).

It is well settled that the standard of care for corporate officers and directors in Massachusetts is

the "standard of complete good faith plus the exercise of reasonable intelligence." *Boston Children's Heart

Foundation v. Nadal-Ginard,* 73 F.3d 429, 433 (1st Cir. 1996), quoting *Murphy v. Hanlon,* 322 Mass. 683,

686, 79 N.E.2d 292 (1948). Officers or directors are not responsible for mere errors of judgment or lack of

prudence in carrying out their duties. *Id.*; see also *Sagalyn v. Meekins, Packard & Wheat, Inc.,* 290 Mass.

434, 438, 195 N.E. 769 (1935).  If they act in good faith but imprudently, they are not subject to personal

liability absent clear and gross negligence. *Boston Children's Heart Foundation,* 73 F.3d at 433.

---

[4] The damages awarded on Count II are the same as those awarded on Count I; Count II merely establishes a second basis of recovery for the same damages.

The duty of loyalty requires one to "be loyal to the corporation and not promote his own interests in a manner injurious to the corporation." *Orsi v. Sunshine Art Studios, Inc.*, 874 F. Supp. 471, 475-76 (D. Mass. 1995) (citing *Johnson v. Witkowski*, 30 Mass. App. Ct. 697, 705, 573 N.E.2d 513 (1991). When a director or officer removes or diverts corporate assets for which the corporation receives no or inadequate benefit, that director or officer breaches his or her duty of loyalty and is liable for waste of corporate assets. See *Coggins*, 397 Mass. at 537. Each transfer of corporate funds for personal benefit that serves no corporate interest causes unfairness to the corporation; each such transfer constitutes a breach of fiduciary duty. *Henderson v. Axiam, Inc.*, 1999 Mass. Super. LEXIS 580, *162-63.

While ordinarily the business judgment rule entitles a director to a presumption that his or her actions were in the best interests of the corporation, where interested or self-dealing transactions are being challenged, the business judgment rule has no application whatsoever. *Starr v. Fordham*, 420 Mass. 178, 184, 648 N.E.2d 1261 (1995). Once a plaintiff has demonstrated that the defendant director or officer has engaged in self-dealing, the burden shifts to the defendant officer or director to demonstrate the fundamental or intrinsic fairness of his actions and that the transactions did not result in harm to the corporation. *Demoulas*, 424 Mass. at 529-30; *Meehan v. Shaughnessy*, 404 Mass. 419, 441, 535 N.E.2d 1255 (1989). The burden is a heavy one. *Coggins v. New England Patriots Football Club, Inc.*, 397 Mass. 525, 532, 492 N.E.2d 1112 (1986) ("Where the director's duty of loyalty to the corporation is in conflict with his self-interest, the court will vigorously scrutinize the situation"), *quoting American Discount Corp. v. Kaitz*, 348 Mass. 706, 711, 206 N.E.2d 156 (1965). To satisfy his burden, not only must a fiduciary demonstrate the intrinsic fairness of the transaction from the point of view of the corporation, but he must also demonstrate that he acted in good faith. *Demoulas v. Demoulas Super Markets, Inc.*, 1995 Mass. Sup. LEXIS 870, *240 (Mass. Super.), *aff'd.*, 424 Mass. 501, 677 N.E.2d 159 (1997). Good faith requires full and honest disclosure of all relevant circumstances to permit a disinterested decision-maker to exercise informed judgment. *Henderson v. Axiam, Inc.,* 1999 Mass. Super. LEXIS 580, *150-52, citing *Dynan v. Fritz*, 400 Mass. 230, 243, 508 N.E.2d 1371 (1987). Upon a breach of the duty of loyalty, the fiduciary will be

24

"liable where he benefits directly or where profits flow instead to a third party or to another company

under the fiduciary's control." *Demoulas*, 424 Mass**.** at 535.

Against these principles of law, I assess the facts found in this case. Casey, as managing member,

officer, and person in control of the Debtor, at all relevant times owed fiduciary duties of care, loyalty, and

good faith to BGP.  Casey had an obligation to exercise due care and diligence in the management and

administration of BGP and in the use and preservation of BGP's property, funds, and assets; and to ensure

that BGP did not engage in unsound management practices. Casey breached his duty of care by (i) failing to

maintain business records for BGP, (ii) failing to comply with applicable tax laws regarding the filing of

income and payroll taxes and the remitting of withheld taxes, (iii) failing to respect BGP as a separate legal

and taxable entity, (iv) causing BGP to fail to observe appropriate formalities and to function as his alter

ego, and (v) transferring BGP funds totaling $1,911,575.74 to himself or for his benefit or to other entities

he controlled, all (except only for the $107,319.90 paid for his services) for no benefit to BGP.

In fulfillment of his obligation of loyalty and duty to act in good faith, Casey was required to deal

fairly and honestly with BGP and to act in a responsible and lawful manner, with undivided loyalty. Casey

breached his fiduciary duties of loyalty and good faith to BGP by: (i) treating BGP's funds as his own and

consistently paying hundreds of  thousands of dollars to himself, to entities he controlled, and to third

parties for his personal benefit without a corresponding benefit to BGP; (ii) engaging in self-dealing without

records and without a corresponding benefit to BGP; (iii) removing funds of BGP from creditors into the

bank account of another entity he controlled and failing to adequately account for their disposition; (iv)

deliberately failing to maintain records from which  an independent third party could trace Casey's self-

dealings, Casey's diversion of BGP assets for his personal benefit, and BGP's financial condition; and (v)

causing BGP to pay for Casey's personal purposes without restriction and without substantiating

documents. In particular, Casey breached his fiduciary duties of care, loyalty, and good faith to BGP by

diverting funds from BGP at a time when BGP was insolvent.

As a result of Casey's breaches of his fiduciary duties of care, good faith, and loyalty, BGP suffered damages in the amount of not less than $1,804,255.84, consisting of the Casey Payments less payment for Casey's service to BGP of $107,319.90.

On account of the foregoing, the Trustee is entitled to judgment on Count III, determining that Casey breached his duties of care, loyalty, and good faith under applicable Massachusetts law, and accordingly that Casey is liable to the Trustee in the principal amount of $1,804,255.84.[5]

The Trustee is also entitled to prejudgment interest on this sum, or each component part of it, from the date on which Casey made each of the component payments.  Since the payments are numerous and their dates not in evidence, I will award prejudgment interest from the date of the Complaint through the date of judgment. Because the underlying cause of action is based on Massachusetts law, prepetition interest accrues at the rate specified in Massachusetts law. *Lassman v. Keefe (In re Keefe)*, 401 B.R. 520, 527 (B.A.P. 1st Cir. 2009) (where state law is the substantive law, the bankruptcy court should have looked to state law to determine the applicable rate of prejudgment interest). Under MASS GEN. LAWS ch. 231, § 6B, the applicable prejudgment interest rate for tort judgments—this count being a business tort involving injury to property interests of the Debtor—at the rate of twelve percent per annum from the date of commencement of the action. As for postjudgment interest, however, the rate is governed by federal law, 28 U.S.C. § 1961(a), even where the substantive law is supplied by state law.

**Count V: Disregard of Corporate Form**

In Count V, the Trustee seeks to pierce the corporate veil of the debtor LLC to hold Casey, as its controlling member, personally responsible for all indebtedness of the LLC on the date of its bankruptcy filing. The Trustee has proceeded as if his authority to prosecute a claim to pierce the corporate veil were

---

[5] The damages awarded on Count III are the same as those awarded on Counts I and II; Count III merely establishes yet another basis of recovery for the same damages.

self-evident. It is not, and the Court knows of no basis for this authority.

A trustee in bankruptcy is a creature of statute and has only those powers expressly given the trustee in the Bankruptcy Code.  There are three principal sources of such authority.

As to Code-created avoidance powers, that authority is found in the Code sections that create the rights of avoidance and recovery.  In Counts I and II, for example, the Trustee was proceeding under sections of the Bankruptcy Code that expressly empower a trustee to prosecute the actions in question. See 11 U.S.C. §§ 548(a) ("The trustee may avoid") and 550(a) ("the trustee may recover"). The present count, however, is not one created by the Bankruptcy Code. It arises under state law.

The second source is § 704(a)(1) of the Bankruptcy Code, which gives a chapter 7 trustee power to "collect and reduce to money the property of the estate." 11 U.S.C. § 704(a)(1); *In re Rare Coin Galleries of Am., Inc.*, 862 F.2d 896, 900 (1st Cir. 1988). Causes of action that belonged to the debtor on the date of the bankruptcy filing are property of the estate. 11 U.S.C. § 541(a)(1) (the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case"). Regarding this count, § 704(1) cannot confer authority on the Trustee because, in Massachusetts law, which governs here, the right to pierce the corporate veil belongs not to the corporation whose veil would be pierced but to its creditors. It is an equitable remedy that allows a creditor having an established claim against the corporation to satisfy that claim against a shareholder.[6] Section 704(1) does not authorize a trustee to prosecute causes of action belonging to the debtor's creditors.

The third source, § 544(b)(1) of the Bankruptcy Code, does authorize a trustee to bring certain causes of action that belong in the first instance to a creditor.  11 U.S.C. § 544(b)(1).  But that authority clearly does not apply here because it is limited to actions "to avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a

---

[6] Some states apparently recognize, in certain circumstances, a right of the corporation itself to pierce the corporate veil. The Trustee has cited no authority for that proposition in Massachusetts law, and I know of none.

creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." *Id*.  A veil-piercing action involves no avoidance of a transfer or of an obligation. And, in any event, the Trustee has not in any event invoked § 544(b)(1) or sought any rulings thereunder.

For these reasons, I conclude that the Trustee lacks authority to prosecute Count V.  And though BGP's creditors may have a right to proceed against Casey on this theory (I express no opinion on the merits of the claim), the Trustee lacks standing to prosecute their claims for them. *Rare Coin Galleries of Am., Inc.*, 862 F.2d at 900 (the trustee has no power to assert any claim on behalf of the creditors when the cause of action belongs solely to them), citing *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 434 [92 S.Ct. 1678, 1688, 32 L.Ed.2d 195] (1972), *In re Ozark*, 816 F.2d 1222, 1229–30 (8th Cir. 1987); and 4 Collier on Bankruptcy ¶ 541.10[8], at 541–70. Count V will accordingly be dismissed.

**CONCLUSION**

On the basis of the forgoing, judgment will enter at the close of this adversary proceeding in favor of the Trustee and against Casey on Counts I, II, and III in the amount of $1,804,255.84 (the "Principal Amount"), plus prejudgment interest on the Principal Amount at the rate of 12 percent from the date of commencement of this adversary proceeding to the date of judgment, plus postjudgment interest at the federal judgment rate on the Principal Amount from the date of the judgment; and in the same judgment the Court will dismiss Count V.

Date: October 19, 2020

_____
Frank J. Bailey
United States Bankruptcy Judge